**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
msirota@coleschotz.com
David M. Bass, Esq.
dbass@coleschotz.com
Rebecca W. Hollander, Esq.
rhollander@coleschotz.com
Court Plaza North
25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
(201) 489-1536 Facsimile

*Proposed Counsel to the Debtor and*
*Debtor-in-Possession*

## UNITED STATES BANKRUPTCY COURT FOR THE
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>ICON EYEWEAR, INC.,[1]<br><br>          Debtor-in-Possession. | Chapter 11<br><br>Case No. 18-_____ (___) |

**DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (1) APPROVING POSTPETITION FINANCING, (2) AUTHORIZING USE OF CASH COLLATERAL, (3) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (4) GRANTING ADEQUATE PROTECTION, (5) MODIFYING AUTOMATIC STAY, AND (6) SCHEDULING A FINAL HEARING**

TO:    Honorable Judge of the United States Bankruptcy Court

       1.     The above-captioned debtor and debtor-in-possession (the "Debtor"), by and through its undersigned proposed counsel, submits this motion (the "Motion"), for the entry of an interim order (the "Interim Order")[2], substantially in the form attached hereto as **Exhibit A**, and

---

[1]  The last four digits of the Debtor's federal identification number are 1657.

[2]  Capitalized terms used herein but not otherwise defined, shall have the meanings ascribed to them in the Interim Order or DIP Credit Agreement, as applicable.

following a final hearing to be set by the Court, entry of a final order (the "<u>Final Order</u>") pursuant to sections 105, 361, 362, 363, 364, 364(e), 503 and 507 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and the Local Rules: (i) authorizing the Debtor to obtain postpetition financing pursuant to a secured debtor-in-possession financing facility (the "<u>DIP Facility</u>") on the terms described herein and in that certain Debtor-in-Possession Loan and Security Agreement, substantially in the form attached hereto as **<u>Exhibit B</u>** (as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof, the "<u>DIP Credit Agreement</u>"); (ii) granting senior perfected liens and superpriority claims to the lender under the DIP Facility, Five Comets, LLC (the "<u>DIP Lender</u>" or "<u>Five Comets</u>"); (iii) authorizing the use of Cash Collateral; (iv) scheduling a final hearing with respect to the relief requested herein; and (v) granting related relief.  In support of this Motion, the Debtor relies on the Declaration of Brian Liston in Support of Debtor's Chapter 11 Petition and First Day Relief (the "<u>First Day Declaration</u>"), and the Declaration of Stephan Pinsly in Support of the Debtor's Motion for Interim and Final Orders (1) Approving Postpetition Financing, (2) Authorizing Use of Cash Collateral, (3) Granting Liens and Providing Superpriority Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, and (6) Scheduling a Final Hearing (the "<u>Pinsly Declaration</u>"), filed contemporaneously herewith, each of which is incorporated herein by reference, and further respectfully states as follows:

## <u>PRELIMINARY STATEMENT</u>

2.      As more fully described in this Motion and in the First Day Declaration, the Debtor requires cash on hand and use of cash flow from its operations to fund its liquidity needs so that it can continue to operate while working toward confirmation of a plan.

3.      The proposed DIP Facility, a new money, multiple draw term loan in the total amount of up to $2,270,000.00, is intended to provide the Debtor with sufficient liquidity to operate during the Chapter 11 Case while it secures an exit facility that will pay off the First Lien Lender (as defined below) under its pre-petition senior secured credit facility at an agreed-upon discounted amount.

4.      Absent post-petition financing, the Debtor's ability to continue operations would be highly uncertain due to limited liquidity and the uncertainty of the amounts and timing of post-petition cash flow.  Without the proposed financing, it would be extremely difficult for the Debtor to operate its business without disruption.  It is therefore imperative that the Debtor has a reliable source of funds to avoid imminent and irreparable harm and to complete a successful reorganization that will generate the maximum value for the benefit of creditors and the estate.

5.      Subject to entry of the Interim Order, the DIP Lender has agreed to fund $425,000 during the interim period, which the Debtor intends to use to fund the Debtor's working capital requirements and other chapter 11 expenses.  Upon final approval, the Debtor expects to draw at least $1,325,000 of the remaining $1,845,000 available under the DIP Facility which will be used to fund working capital needs through the intended confirmation date.

6.      The terms of the DIP Facility reflect the best financing terms the Debtor was able to obtain, and there is no more favorable alternative financing available to the Debtor as of the date of this Motion.  Indeed, in light of the First Lien Lender's unwillingness to subordinate to any other lender, the Debtor would have simply been unable to find any third party willing to provide new money to the Debtor.  It therefore turned to its principal shareholders, Michael and Julie Chang, who, through entities in which they are members, agreed to provide financing to the Debtor in the weeks leading up the chapter 11 filing and to continue funding the Debtor through

the DIP Facility.  As described in the First Day Declaration, without the funds from the DIP

Lender (and its predecessor), the Debtor would have been forced to cease operations and

liquidate, which would have resulted in no recovery to creditors other than the First Lien Lender.

Accordingly, the terms of the DIP Facility are not only the most favorable terms the Debtor

could obtain, but the only terms the Debtor could obtain under the circumstances.

7.      The Debtor also seeks approval of the continued use of the Prepetition Lenders'

collateral, including Cash Collateral, to which the Prepetition Lenders consent.  Such use of

collateral, together with the DIP Facility, will provide the Debtor sufficient liquidity to operate

during the Chapter 11 Case.

8.      Accordingly, the Debtor respectfully request that the DIP Facility and the

Debtor's use of the Prepetition Lenders' Cash Collateral be approved.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and

1334 and the Standing Order of Reference to the Bankruptcy Court Under Title 11 of the United

States District Court for the District of New Jersey, entered on July 23, 1984, and amended on

September 18, 2012 (Simandle, C.J.).  Venue is proper in this district pursuant to 28 U.S.C.

§§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

10.     The statutory bases for the relief requested herein are sections 105, 361, 362,

363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, and 507 of the Bankruptcy Code,

Bankruptcy Rules 2002, 4001, and 9014 and the Local Rules.

## BACKGROUND

**A.      General Background**

11.     On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for

relief under chapter 11 of the Bankruptcy Code, commencing the above captioned chapter 11

case (the "Chapter 11 Case") in the United States Bankruptcy Court for the District of New

Jersey.

12.     The Debtor is operating its business and managing its property as a debtor-in-

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the filing of

this Motion, no request has been made for the appointment of a trustee or examiner and no

statutory committee has been appointed in this case.

13.     The factual background regarding the Debtor, including its business operations,

its capital and debt structures and the events leading to the filing of the Chapter 11 Case, is set

forth in detail in the First Day Declaration.

14.     As more fully described below and in the First Day Declaration, the Debtor

requires use of cash and cash flow from its operations to fund its operating needs, so that it can

continue to operate its business and preserve its highest and best value, while working toward the

repayment of the agreed-upon discounted amount to the First Lien Lender and emerge from

chapter 11.  The Debtor also requires access to additional funds in the form of debtor-in-

possession financing to operate throughout the chapter 11 process.

**B.      The Prepetition Credit Facilities**

        **(a)      The First Lien Loans**

15.     On June 8, 2012, M&T Bank, Manufacturers and Traders Trust Company (the

"First Lien Lender") extended a $10,000,000.00 secured, revolving, asset-based loan to the

Debtor (the "First Lien Loans").  The First Lien Loans are evidenced and governed by, *inter alia*,

a Standard LIBOR Grid Note (as amended, the "First Lien Note"), a Credit Agreement, as

amended by that certain Amendment No. 1 to Credit Agreement dated October 7, 2014, and a

General Security Agreement (the "First Lien Documents").

16.     The "Obligations" under the First Lien Loans (as defined therein and defined hereinafter as the "First Lien Obligations") are secured by all or substantially all of the Debtor's assets, including, without limitation, all accounts, chattel paper, investment property, deposit accounts, documents, goods, equipment, farm products, general intangibles (including trademarks, service marks, trade names, patents, copyrights, licenses and franchises), instruments, inventory, money, letter of credit rights, causes of action (including tort claims), and other personal property (including agreements and  instruments not constituting chattel paper or a document, general intangible, or instrument) (collectively, the "First Lien Collateral").

17.     The First Lien Obligations are guaranteed by Michael Chang and Julie Chang.

18.     The First Lien Note has been amended from time to time.  On February 12, 2016, the Debtor and M&T entered into a Fifth Amended and Restated Line of Credit Note Standard LIBOR Grid Note (LIBOR and Prime) in the principal amount of $20,000,000, which is the current Note in place.

19.     In connection with the First Lien Loans, the First Lien Lender issued a $250,000 Irrevocable Standby Letter of Credit in favor of the landlord of the Debtor's South Hackensack facility (the "**Standby Letter of Credit**").  As of the Petition Date, the landlord had not drawn upon the Standby Letter of Credit.

20.     By letter dated August 29, 2018, the First Lien Lender declared the First Lien Loans to be in default.  Following its notice of default, the First Lien Lender ceased providing any additional funding to the Debtor under the revolving credit facility.

21.     As of the Petition Date, the Debtor owed the First Lien Lender approximately $7.8 million with respect to the First Lien Loans, including on account of the amounts committed under the Standby Letter of Credit.

### (b)    The Second Lien Loans

22.      With no access to the revolving credit line contemplated by the First Lien Loans and limited liquidity, and needing to fund the November 30 payroll and rent for the month of December 2018, on November 30, 2018, the Debtor obtained a loan from Three S Investments, LLC (the "Second Lien Lender" and, together with the First Lien Lender, the "Prepetition Lenders"), an entity owned by Michael Chang, pursuant to which the Second Lien Lender extended a loan to the Debtor in the amount of $300,000 (the "Initial Second Lien Loan").

23.      In connection with the Initial Second Lien Loan the Debtor executed a Promissory Note dated November 30, 2018, in the principal amount of $300,000 (the "November 30 Second Lien Note") and a Second Lien Security Agreement dated November 30, 2018 (the "Second Lien Security Agreement").

24.      In accordance with the Second Lien Security Agreement, as collateral security for the performance of any and all debts, liabilities, obligations, warranties, representations, covenants, and undertakings of the Debtor to the Second Lien Lender, direct or indirect, absolute or contingent, due or to become due, then existing or thereafter arising (collectively, the "Second Lien Obligations"), the Debtor granted to the Second Lien Letter a collateral security interest in all of the Debtor's assets, including All Accounts, Accounts Receivable, Chattel Paper, Commercial Tort Claims, Copyrights, Deposit Accounts, Documents, Equipment, General Intangibles, Instruments, Inventory, Investment Property, Letters of Credit, Liens, Patents, and Trademarks of Debtor, and all Proceeds of any of the forgoing, as each such term is defined in the UCC and all other assets of whatsoever kind, nature and description of Debtor, whether now or hereafter existing or now owned or hereafter acquired or created and wherever located,

including any and all additions, accessions, replacements, and substitutions of, to or for same, together with the proceeds and products thereof (the "Second Lien Collateral").

25.     As noted in the Second Lien Security Agreement, the security interest granted to the Second Lien Lender in the Second Lien Collateral was expressly subordinated to the prior security interest in all of Debtor's assets granted to the First Lien Lender.

26.     Following the Initial Second Lien Loan, the Debtor again needed access to capital to fund working capital needs and payroll.

27.     Accordingly, on December 11, 2018, the Second Lien Lender extended the Debtor a second loan in the amount of $35,000 (the "December 11 Second Lien Loan") to fund certain operating expenses.  In connection with the December 11 Second Lien Loan, the Debtor signed a Promissory Note dated December 11, 2018, in the principal amount of $35,000, in favor of the Second Lien Lender (the "December 11 Second Lien Note").  Like the Initial Second Lien Loan, the December 11 Second Lien Loan, evidenced by the December 11 Second Lien Note, is expressly subordinate to the First Lien Loans.  The obligations under the December 11 Second Lien Loan are secured by the Second Lien Security Agreement.

28.     Shortly after funding the December 11 Second Lien Loan, on December 14, 2018, the Second Lien Lender extended the Debtor a third loan to permit the Debtor to, among other things, fund the December 14 payroll.  The third loan, in the amount of $200,000 (the "December 14 Second Lien Loan"), is evidenced by a Promissory Note, dated December 14, 2018, in the principal amount of $200,000, in favor of the Second Lien Lender (the "December 14 Second Lien Note").  Like the Initial Second Lien Loan and the December 11 Second Lien Loan, the December 14 Second Lien Loan is expressly subordinate to the First Lien Loans.  The

obligations under the December 14 Second Lien Loan are secured by the Second Lien Security

Agreement.

29.     Finally, shortly before the filing of the Chapter 11 Case, the Second Lien Lender

extended a fourth and final loan to the Debtor, in the amount of $195,000 (the "Final Second

Lien Loan" and together with the Initial Second Lien Loan, the December 11 Second Lien Loan

and the December 14 Second Lien Loan, the "Second Lien Loans").  The Final Second Lien

Loan is evidenced by a Promissory Note, in the principal amount of $195,000, in favor of the

Second Lien Lender (the "Final Second Lien Note" and together with the November 30 Second

Lien Note, the December 11 Second Lien Note, and the December 14 Second Lien Note, the

"Second Lien Notes" and the Second Lien Notes and the Second Lien Security Agreement shall

be referred to hereinafter as the "Second Lien Documents").

30.     The Final Second Lien Loan is also secured by the Second Lien Security

Agreement and is expressly subordinate to the First Lien Loans.

31.     On December 20, 2018, following the funding of the Final Second Lien Loan, the

Second Lien Lender assigned to Five Comets the Second Lien Documents, together with all

liens, claims, right, title, and interest of the Second Lien Lender in the Second Lien Loans.

32.     As of the Petition Date, the Debtor owed the Second Lien Lender (now Five

Comets, as assignee) no less than $730,000 with respect to the Second Lien Loans.

**(c)     Intercreditor Agreement**

33.     The First Lien Lender and the Second Lien Lender entered into a General

Subordination Agreement, dated as of December 20, 2018 (the "Prepetition Intercreditor

Agreement"), which was acknowledged and agreed to by the Debtor, and pursuant to which the

parties thereto agreed, among other things, that (1) the security interests and liens of the First

Lien Lender upon the First Lien Collateral would be senior in all respects to the security interests

and liens of the Second Lien Lender on such property, and (2) the Second Lien Lender is not

permitted to receive payments of either principal, interest, or any other amounts until the final and

indefeasible payment in full in cash of the Obligations due to the First Lien Lender.  In addition,

the Prepetition Intercreditor Agreement controls the Second Lien Lender's ability to exercise

remedies against the First Lien Collateral, such that the Second Lien Lender cannot exercise

remedies against any First Lien Collateral until the obligations under the First Lien Loan are

discharged in full.

**C.**      **Efforts to Obtain DIP Financing and the Debtor's Liquidity Needs**

34.      As noted in the First Day Declaration, and set forth  in the Pinsly Declaration, in

October of 2018, the Debtor retained Getzler Henrich & Associates LLC ("Getzler Henrich"), a

financial advisory firm, charging Getzler Henrich with locating other sources of financing and

working with the Debtor to address the Debtor's defaulted debt with the First Lien Lender.

35.      At the time of Getzler Henrich's engagement, the First Lien Lender had already

ceased funding under the First Lien Loans and the Debtor was suffering from a liquidity crisis.

Indeed, Getzler Henrich concluded that without additional funding, the Debtor would soon run

out of cash and be forced to cease operating.  As a result, Getzler Henrich engaged regularly with

the First Lien Lender in the hope that the First Lien Lender would resume funding to the Debtor

or, alternatively, permit a third party lender to provide financing to the Debtor that would be

senior to the existing liens of the First Lien Lender in the First Lien Collateral.  The First Lien

Lender refused (believing, based on, among other things, a valuation and review that it had

received earlier in the year, that it was significantly undersecured).

36.      In light of the Debtor's deeply distressed financial condition, the First Lien

Lender's unwillingness to subordinate to a new lender, and the favorable terms of the DIP Loan

proposed by the DIP Lender (affiliated with the principal shareholders of the Debtor), Getzler

Henrich advised the Debtor that there would be little to gain from embarking on a futile search

for a better postpetition financing alternative.

37.      In connection with the DIP Facility, the Debtor's restructuring advisor, Getzler

Henrich, assisted the Debtor in connection with a budget forecasting projected cash flows for the

10-week period after the Petition Date (attached hereto as **Exhibit C**) (the "Forecast Budget")

(when the Debtor hopes to emerge from chapter 11).  As shown in the Forecast Budget, Cash

Collateral is not sufficient to fund the Chapter 11 Case and the Debtor's business between the

Petition Date and the projected confirmation date.  Absent this Court's approval of the proposed

DIP Facility and the Debtor's use of Cash Collateral, the Debtor would immediately run out of

funds required to operate its business and would not be able to proceed with the restructuring

contemplated hereby.   Consequently, there is urgent and immediate need to obtain the

postpetition financing provided by the DIP Facility in addition to the use of Cash Collateral.

## RELIEF REQUESTED

38.      By this Motion, the Debtor requests that the Court enter an Order: (i) approving

the DIP Facility and any related loan documents (the "DIP Loan Documents"); (ii) authorizing

the Debtor to enter into the DIP Credit Agreement; (iii) authorizing the Debtor to use the DIP

Facility to fund post-petition working capital needs, including administrative costs and expenses

of the Chapter 11 Case; (iv) permit the Debtor to grant liens and security interests in the Debtor's

property, senior to all other Liens except for the Lien of the First Lien Lender granted under the

First Lien Documents, on all of the DIP Collateral (as defined below); (v) authorizing the Debtor

to grant to the DIP Lender valid, enforceable and fully perfected first priority security interests

and superpriority claims; (vi) subject to entry of the Final Order, waiving rights under section

506(c), the "equities of the case" under section 552(b), as well as the doctrine of marshalling;

(vii) authorizing the Debtors to use "cash collateral," as that term is defined in section 363(a) of

the Bankruptcy Code ("Cash Collateral") and all other Prepetition Collateral, subject to the terms

of the DIP Loan Documents and the DIP Orders and (viii) modifying the automatic stay; and (ix)

scheduling a final hearing on this Motion.

## SUMMARY OF MATERIAL TERMS OF DIP FINANCING

39.    In accordance with Bankruptcy Rule 4001(c)(1) and D.N.J. LBR 4001-3, the

following is a concise statement and summary of the proposed material terms of the DIP

Financing, as specified in the DIP Credit Agreement and the Interim Order:[3]

| Material Provision | Summary Description of Material Provision |
|---|---|
| Borrower | Icon Eyewear, Inc. ("Borrower") |
| DIP Lender | Five Comets, LLC |
| Security | Senior lien on all of Borrower's assets, including without limitation all of the pre- and post-petition assets and property of the Debtor, and all other tangible and intangible personal property of the Debtor, wherever located and whether now owned or hereafter acquired, including but not limited to all now existing and hereafter acquired or arising Accounts, Goods, General Intangibles (including, without limitation, all Intellectual Property of Borrower), Payment Intangibles, Deposit Accounts (including, without limitation, the Deposit Account and the Receivables Account), Chattel Paper (including, without limitation, Electronic Chattel Paper), Documents, Instruments, Software, Investment Property, Letters of Credit, Letter-of-Credit Rights, Commercial Tort Claims, money, Equipment, Inventory, Fixtures, and Supporting Obligations, together with all products of and Accessions to any of the foregoing and all Proceeds of any of the foregoing (including without limitation all insurance policies and proceeds thereof) (as each such term above is defined in the UCC) (the "Collateral"), subject only to the Permitted First Lien.  (DIP Credit Agreement, Definitions, Section 2.1; Interim Order, Paragraph C, 11(a))<br><br>All Postpetition Obligations hereby constitute under section 364(c)(1) of the Bankruptcy Code allowed superpriority administrative expense |

---

[3] This summary is qualified, in its entirety by the provisions of the DIP Credit Agreement and the proposed Interim Order and Final Order. Unless otherwise set forth in this summary, capitalized terms used within this summary shall have the meanings ascribed to them in the DIP Credit Agreement.

|  | claims against the Debtor having priority over all administrative expenses of the kind specified in, or ordered pursuant to, any provision of the Bankruptcy Code, including, without limitation, those specified in, or ordered pursuant to, sections 105, 326, 328, 330, 503(b), 506(c), 507(a), 507(b), 546(c), and, to the extent permitted by law, sections 726 and 1114 or any other provision of the Bankruptcy Code or otherwise, and shall at all times be senior to the rights of the Debtor, the Debtor's Estate and any trustee or estate representative in the Case or any Successor Case (the "Superpriority Claims").  No cost or expense of administration under any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 363, 364, 503, 506, 507, 546, 726, 1113 or 1114 or any other provision of the Bankruptcy Code or otherwise (whether incurred in this Case and any Successor Case), shall be senior to, equal to, or *pari passu* with, the Superpriority Claims.  Notwithstanding the foregoing, any superpriority administrative expense claims granted hereunder shall be subordinate to the First Lien Obligations. (Interim Order, paragraph 11(c)) |
|---|---|
| **Facility Amount** | Up to $2,270,000.00 in one or more advances (DIP Credit Agreement, paragraph 1.1. Interim Order, paragraph 2) |
| **Material Conditions to Advances and Extensions of Credit** | Closing and the initial funding under the DIP Facility will be subject to the conditions outlined in Sections 1.4(a) and (d) and 1.5 of the DIP Credit Agreement, including, among other things, execution of the DIP Loan Agreement, entry of the Interim Order (and thereafter the Final Order), and receipt of the Forecast Budget by the DIP Lender (DIP Credit Agreement, Sections 1.4(a) and (d) and 1.5) |
| **Maturity Date** | The earlier of: (i) March 31, 2019, and (ii) the acceleration of the Loan by Lender upon an Event of Default (DIP Credit Agreement, Definitions) |
| **Fees for Loan** | None. |
| **Interest Rate** | Prime + 2.0% per annum, payable in upon the Maturity Date (DIP Credit Agreement, Definitions, Section 1.3) |
| **Exit Fee** | None. |

| | |
|---|---|
| **Waiver of Rights under Section 506(c), Equities of Case under Section 552(b), and Doctrine of Marshalling** | These waivers are being requested subject to entry of the Final Order (Interim Order, paragraph 16) |
| **Events of Default** | Detailed in Section 6.1 of the DIP Credit Agreement and the list of Cash Collateral Events of Default in paragraph 9 of the Interim Order. |
| **Termination Provisions** | Paragraph 20 of the Interim Order contains provisions terminating the DIP Loans and use of Cash Collateral upon certain events of default, including (A) the filing of a challenge to the lender's pre-petition lien or claim; (B) the entry of an order granting relief from the automatic stay; and (C) the filing of a motion for the appointment of a trustee or examiner. *See also* Section 6.1 of the DIP Credit Agreement and the Cash Collateral Events of Default in paragraph 9 of the Interim Order. |
| **Waiver of Automatic Stay** | Modified as necessary to effectuate all terms, benefits, privileges, remedies and provisions of Interim Order and the DIP Loan Documents, without further notice or order of the Court (Interim Order, paragraph 17) |
| **Carve-Out** | Not applicable |
| **Indemnification** | As detailed in paragraph 13 of the Interim Order, the Debtor is requesting that it be authorized and to and indemnify and hold harmless the DIP Lender and certain of its affiliates. (Interim Order, paragraph 13; DIP Credit Agreement, Section 7.4). |
| **Post-Petition Lien on Debtor's Claims and Causes of Action** | The Interim Order provides for = the DIP Lender to receive liens on the Debtor's claims and causes of action arising under sections 544, 545, 547, 548, and 549 of the Bankruptcy Code subject to the entry of the Final Order. (Interim Order, paragraph 11(a)) |
| **Adequate Protection** | The First Lien Lender shall receive adequate protection to the extent of any diminution in value of its interests in the Prepetition Collateral from and after the Petition Date, including through the provision of replacement liens, superpriority administrative claims, current cash payment of reasonable fees and expenses, including attorneys' fees, and monthly cash payments. The First Lien Lender shall maintain its first priority lien.<br><br>*See* Interim Order, ¶ 8. |

| | |
|---|---|
| **Effect of Liens; Second Lien Claims** | The First Lien Lender shall maintain its first priority lien.<br><br>The Second Lien Lender consents to the subordination of its lien.  As a condition to such subordination and priming, the Second Lien Lender, requires that the Second Lien Loans be assumed and affirmed by the Debtor and shall continue and remain outstanding as obligations of the Debtor as if such Second Lien Loans had been requested under and issued after the Petition Date (and all such obligations shall constitute Postpetition Obligations under this Interim Order).<br><br>*See* Interim Order, ¶¶ C, J. |
| **Restrictions on Liens** | Paragraph 11(d) of the Interim Order provides that the Postpetition Liens shall not be (i) subject to any Lien that is avoided and preserved for the benefit of the Estate under section 551 of the Bankruptcy Code (including, for the avoidance of doubt, as a result of the avoidance, disallowance, termination or setting aside, by this Court or otherwise, of any obligations under the Prepetition Loan Documents), or (ii) subordinated to or made *pari passu* with any other Lien under section 364(d) of the Bankruptcy Code or otherwise.  Except as expressly set forth herein with respect to the First Lien Obligations, no claim or Lien having a priority superior to or *pari passu* with those granted by this Interim Order with respect to the Postpetition Obligations shall be granted or allowed until the indefeasible payment in full in cash and satisfaction in the manner provided in the DIP Loan Documents or the Postpetition Obligation.  (Interim Order ¶ 11(d)). |
| **Binding Agreements on Debtor** | Subject to the rights of third parties, including an appointed committee, to bring Claims and Challenges against the Prepetition Lenders and the DIP Lender, the Debtor has stipulated to the validity, perfection and amount of all claims of the Prepetition Lenders.<br><br>Paragraph 19 of the Interim Order |

## BASIS FOR RELIEF

I.      **The Debtor Should Be Authorized to Obtain the DIP Facility Under Section 364 of the Bankruptcy Code**

40.      Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security.  If a debtor in possession cannot obtain postpetition credit on an unsecured basis, pursuant to section 364(c) of the Bankruptcy Code, a court may authorize the obtaining of credit or the incurring of debt,

repayment of which is entitled to superpriority administrative expense status or is secured by a

senior lien on unencumbered property or a junior lien on encumbered property, or a combination

of the foregoing.

41.    Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part,

that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit

allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code to obtain

credit or incur debt:

- with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code;

- secured by a lien on property of the estate that is not otherwise subject to a lien; or

- secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).  Thus, pursuant to section 364(c) of the Bankruptcy Code, a debtor may, in

the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain

adequate unsecured credit, and the proposed borrowing is in the best interests of its estate. *See,*

*e.g., Richmond Leasing Co. v. Capital Bank, NA.*, 762 F.2d 1303, 1311 (5th Cir. 1985) (Indeed,

"more exacting scrutiny [of the debtor's business decisions] would slow the administration of the

debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private

control of administration of the estate, and threaten the court's ability to control a case

impartially"); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to

postpetition credit, courts "permit debtors-in-possession to exercise their basic business

judgment consistent with their fiduciary duties"); *see also* 3 Collier on Bankruptcy ¶ 364.03

(Alan N. Resnick & Henry J. Sommer eds. 16th ed.).

42.    The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under § 503(b)(l) of [the Bankruptcy Code] as an administrative expense." *See Ames Dep't Stores*, 115 B.R. at 37–39 (a debtor must show it has made a reasonable effort to seek other sources of financing under Bankruptcy Code §§ 364(a) and (b)); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987), *modified on other grounds*, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under Bankruptcy Code § 364(c) must prove it was unable to obtain unsecured credit pursuant to Bankruptcy Code § 364(b)).

43.    Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c):

- the debtor is unable to obtain unsecured credit solely under section 364(b) (*i.e.*, by granting a lender administrative expense priority);

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*See, e.g., In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011); *In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above test and holding that "[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere"); *Ames Dep't Stores*, 115 B.R. at 37-39.

44.      To show financing required is not obtainable on an unsecured basis, a debtor need

only demonstrate "by a good faith effort that credit was not available without" the protections of

section 364(c).  *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d

1085, 1088 (4th Cir. 1986).  "The statute imposes no duty to seek credit from every possible

lender before concluding that such credit is unavailable."  *Id.*  When few lenders are likely to be

able and willing to extend the necessary credit to a debtor, "it would be unrealistic and

unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re

Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Savs. Bank

FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115

B.R. at 40 (approving financing facility and holding the debtor made reasonable efforts to satisfy

the standards of section 364(c) where it approached four lending institutions, was rejected by

two, and selected the most favorable of the two offers it received).

45.      As the Pinsly Declaration makes clear, once the First Lien Lender refused to

subordinate its liens, and given that the First Lien Lender is likely undersecured, the Debtor had

no hope of securing financing on more favorable terms that the DIP Lender provided.  The

Debtor cannot, under the circumstances, obtain (a) adequate unsecured credit allowable under

section 503(b)(1) of the Bankruptcy Code as an administrative expense; (b) credit for money

borrowed secured solely by a lien on property of the estate that is not otherwise subject to a lien;

or (c) credit for money borrowed secured by a junior lien on property of the estate which is

subject to a lien, in each case, on more favorable terms and conditions than those provided in the

DIP Financing.  The DIP Facility, in the Debtor's judgment, meets the Debtor's requirements to

obtain a reliable source of funding.

46.     For these reasons, the Debtor believes that entry into the DIP Credit Agreement is in the best interest of the Debtor's estate, is necessary to preserve the value of estate assets, and is an exercise of the Debtor's sound and reasonable business judgment.

**A.      The DIP Financing is Necessary to Preserve the Assets of the Estate**

47.     The DIP Facility will allow continued operation the Debtor's operations, provided that the Debtor continues to receive payments owed by the Debtor's key customers.  Without immediate approval of a new source of future liquidity, the Debtor's business operations and the Chapter 11 Case in general could be seriously jeopardized.  The new liquidity offered by the proposed DIP Facility will give the Debtor the opportunity to continue operating until it can secure an exit facility lender and emerge from chapter 11.

**B.      The Terms of the DIP Financing Are Fair, Reasonable, and Appropriate**

48.     The proposed DIP Financing provides generally that the security interests and superpriority administrative expense claims granted to the DIP Lender are subordinate to the claims and interests of the First Lien Lender, as described above.  The Second Lien Lender's liens and claims will be subordinate and the Second Lien Lender has consented to the subordination of its lien, provided is the Second Lien Documents are assumed by the Debtor and repaid with the DIP Facility.

49.     Notably, there are no fees associated with obtaining the DIP Facility and the rate of interest (at Prime +2%) is, in the Debtor's judgment, fair and reasonable under the circumstances, especially considering the DIP Lender's liens will be subordinate to the First Lien Lender's liens and claims.

50.     The Debtor is unable to obtain alternate credit sources on more favorable terms, the terms of the DIP Facility have been negotiated at arms-length and are not principally for the

benefit of a creditor to the detriment of other parties in interest, and the Debtor believes, in its

business judgment, the DIP Facility is in the best interest of all parties involved.

**C.    Application of the Business Judgment Standard**

51.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or

superpriority financing under the circumstances specified therein.  Provided that an agreement to

obtain secured credit does not undermine the policies underlying the Bankruptcy Code, courts

grant a debtor considerable deference in the exercise of its sound business judgment in obtaining

such credit.  *See, e.g.*, *In re Ames Dept. Stores, Inc*., 115 B.R. at 40 ("[C]ases consistently reflect

that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on

grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the

financing agreement does not contain terms that leverage the bankruptcy process and powers or

its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *Trans

World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974

(Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility

"reflect[ed] sound and prudent business judgment").  Thus, the "normal function in reviewing

requests for post-petition financing is to defer to a debtor's own business judgment so long as a

request for financing does not leverage the bankruptcy process and unfairly cede control of the

reorganization to one party in interest."  *In re Barbara K Enters., Inc.*, Case No. 08-11474, 2008

WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008).

52.    To determine whether this standard is met, the Court is "required to examine

whether a reasonable business person would make a similar decision under similar

circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006), *appeal denied,

judgment aff'd*, Adv. Pro. No. 06-33-(KJC), 2008 WL 522516 (D. Del. Feb. 27, 2008), *vacated

and remanded on other grounds*, 607 F.3d 957 (3d Cir. 2010), *as amended* (June 24, 2010); *see*

*also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting courts

should not second guess a debtor's business decision when the decision involves "a business

judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's]

authority under the [Bankruptcy] Code") (internal citation omitted).

53.     Courts recognize that a debtor is entitled (if not required), in exercise of its

business judgment, to consider non-economic benefits offered by a proposed postpetition

facility:

> Although all parties, including the Debtor and the Committee, are
> naturally motivated to obtain financing on the best possible terms, a
> business decision to obtain credit from a particular lender is almost
> never based purely on economic terms.  Relevant features of the
> financing must be evaluated, including noneconomic elements such
> as the timing and certainty of closing, the impact on creditor
> constituencies and the likelihood of a successful reorganization.

*In re ION Media Networks, Inc.*, Case No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y.

Jul. 6, 2009).  After evaluating all options, the Debtor has concluded the DIP Facility provides

the best alternative available in the circumstances of this case.  (Indeed, it is the only available

source of postpetition financing).  Bankruptcy courts routinely defer to a debtor's business

judgment on most business decisions, including the decision to borrow money, unless such

decision is arbitrary and capricious.  *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974

(Bankr. D. Del. 1994) (noting the interim loan, receivables facility, and asset-based facility were

approved because they "reflect[ed] sound and prudent business judgment on the part of TWA . . .

[were] reasonable under the circumstances and in the best interest of TWA and its creditors").  In

fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase

its costs, interfere with the Bankruptcy Code's provision for private control of administration of

the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

54.     The Debtor's determination to move forward with the DIP Facility is an exercise of its sound business judgment.  Specifically, the Debtor and its advisors undertook an analysis of the Debtor's projected financing needs and determined the Debtor would require significant postpetition financing to support its operational and restructuring activities through closing on a restructuring of its debt, with terms that would provide flexibility in the event that the Debtor experiences a delay in its receipt of revenues from when they are due in the ordinary course. Accordingly, the Debtor negotiated the DIP Credit Agreement with the DIP Lender in good faith, at arm's-length, and with the assistance of its advisors.  The DIP Facility provides the Debtor with the capital necessary to meet the working capital needed to fund the Debtor's operations during the course of the time period expected for completion of its restructuring.  This kind of determination reflects the quintessential exercise of business judgment and is entitled to deference from the Court.  *See In re Trans World Airlines, Inc.*, 163 B.R. at 974 (finding the debtor's entry into the financing that served as the "framework" and "cornerstone" for the debtor's plan of reorganization reflected exercise of the debtor's "sound and prudent business judgment").

55.     Accordingly, the DIP Facility reflects an exercise of sound business judgment that should be approved. *See ION Media*, 2009 WL 2902568, at *4 ("[C]ooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.").

**D.      The DIP Lender Should Be Deemed a Good Faith Lender Under Section 364(e)**

56.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its rights in any lien or security interest securing those

loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed

or modified on appeal. Section 364(e) provides as follows:

> The reversal or modification on appeal of an authorization under
> this Section [364 of the Bankruptcy Code] to obtain credit or incur
> debt, or of a grant under this Section of a priority or a lien, does
> not affect the validity of any debt so incurred, or any priority or
> lien so granted, to an entity that extended such credit in good faith,
> whether or not such entity knew of the pendency of the appeal,
> unless such authorization and the incurring of such debt, or the
> granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

57.     As explained in detail herein, the DIP Facility is the result of the Debtor's

reasonable and informed determination that the DIP Lender offered the most favorable terms on

which to obtain needed postpetition financing, and was the product of extended arm's length,

good faith negotiations between and among the Debtor and the DIP Lender.  The terms and

conditions of the DIP Facility are fair and reasonable, and the proceeds of the DIP Facility will

be used only for purposes that are permissible under the Bankruptcy Code.  Further, no

consideration is being provided to any party to the DIP Facility other than as described herein.

Accordingly, the Court should find the DIP Lender is a "good faith" lender within the meaning

of section 364(e) of the Bankruptcy Code, and that it is entitled to all of the protections afforded

thereby.[4]

## II.     The Debtor Should Be Authorized to Use Cash Collateral

58.     In addition to the DIP Facility, the Debtor proposes to use the Prepetition

Lenders' Cash Collateral to pay ordinary and necessary business expenses.  Absent use of the

---

[4] It should be noted that although the members of the DIP Lender include the current shareholders of the
Debtor, the DIP Lender is managed by Richard Hauer, an unaffiliated, third party independent manager, with
significant experience in the restructuring field and familiar with the provisions of debtor in possession financing.
Mr. Hauer, with the assistance of the DIP Lender's professionals, negotiated the terms of the DIP Facility with the
Debtor and its professionals.  The negotiations were completely arms' length and in good faith, which the Debtor
submits is apparent from the DIP Facility's somewhat modest terms.

Prepetition Lender's Cash Collateral, the Debtor's operations would cease, causing the Debtor's estates to suffer immediate and irreparable harm.  The use of the Prepetition Lender's Cash Collateral will be governed by the Forecast Budget and the terms of the Interim (and ultimately Final) Orders.

59.    Section 363(c)(2) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Specifically, that provision provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A)    each entity that has an interest in such cash collateral consents; or
>
> (B)    the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

60.    The Debtor has satisfied the requirements of sections 363(c)(2) and 363(e), and should be authorized to use the Cash Collateral.  First, as discussed above, the requisite Prepetition Lenders consent to the use of the Cash Collateral.  Second, the Debtors is providing the Prepetition Lenders with adequate protection, including, in the case of the First Lien Lender, replacement liens on the DIP Collateral, including Cash Collateral, in accordance with the priorities set forth in and subject to the Prepetition Intercreditor Agreement, as well as the other protections provided in the Interim Order.

61.    As described above, the Debtor has an urgent need for the immediate use of the Prepetition Collateral, including the Cash Collateral, to honor obligations critical to the success

of its ongoing operations, including to employees, vendors, and customers.  Absent access to

Cash Collateral, the Debtor cannot continue to operate its business postpetition, diminishing the

value of the Debtor's estate to the detriment of all stakeholders, including the Prepetition

Lenders.

62.     Therefore, the Debtor submits that it should be authorized to use the Cash

Collateral on the terms set forth in the Interim Order.

**E.      Request for Modification of the Automatic Stay**

63.     Bankruptcy Code section 362 provides for an automatic stay upon the filing of a

bankruptcy petition.  The proposed Interim Order contemplates the modification of the automatic

stay (to the extent applicable) to the extent necessary to implement the terms of the Interim

Order.  Stay modification provisions of this sort are ordinary and usual features of DIP facilities

and, in the Debtor's business judgment, are reasonable under the present circumstances.

Accordingly, the Debtor respectfully requests the Court authorize the modification of the

automatic stay in accordance with the terms set forth in the Interim Order and DIP Credit

Agreement.

**REQUEST FOR FINAL HEARING**

64.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor request the

Court set a date for the Final Hearing as soon as practicable and fix the date and time prior to the

Final Hearing for parties to file objections to the relief requested by this Motion.

**WAIVER OF BANKRUPTCY RULES 6004(A) AND (H)**

65.     An efficient and expeditious approval and implementation of the DIP Facility is in

the best interest of the Debtor and its creditors and other parties in interest.  Accordingly, the

Debtor requests a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-

day stay of orders authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## WAIVER OF MEMORANDUM OF LAW

66.    Because the legal basis upon which the Debtor relies is incorporated herein and

the Motion does not raise any novel issues of law, the Debtor respectfully requests that the Court

waive the requirement to file a separate memorandum of law pursuant to D.N.J.

LBR 9013-1(a)(3).

## NOTICE

67.    Notice of this Motion has been given to (i) the Office of the United States Trustee

for the District of New Jersey, One Newark Center, Suite 2100, Newark, NJ 07102, Attn: Peter J.

D'Auria; (ii) the Internal Revenue Service, 2970 Market Street, Mail Stop 5-Q30.133,

Philadelphia, PA 19104-5016; (iii) the New Jersey Division of Taxation Compliance and

Enforcement - Bankruptcy Unit, 50 Barrack Street, 9th Floor, Trenton, NJ 08695; (iv) the Office

of the Attorney General of the State of New Jersey, Division of Law, Richard J. Hughes Justice

Complex, 25 Market Street, Trenton, NJ 08625; (v) the Office of the United States Attorney,

Peter Rodino Federal Building, 970 Broad Street, Suite 700, Newark, NJ 07102; (vi) counsel for

the First Lien Lender, Klehr Harrison Harvey Branzburg LLP, 10000 Lincoln Drive East, Suite

201, Marlton, NJ 08053, Attn.: Carol Slocum; and (vii) counsel for the Second Lien Lender and

the DIP Lender, Law Offices of Kenneth L. Baum LLC, 167 Main Street, Hackensack, New

Jersey 10601, Attn.: Kenneth L. Baum; and (viii) the Debtor's twenty largest unsecured creditors

on a consolidated basis.  In light of the nature of the relief requested herein, the Debtor

respectfully submits that no other or further notice is required.

## NO PRIOR REQUEST

68.    No prior motion for the relief requested herein has been made to this or any other

court.

## <u>CONCLUSION</u>

**WHEREFORE**, the Debtor respectfully requests that the Court enter an Order granting

the relief requested in the Motion and such other relief as the Court deems just and appropriate

under the circumstances.

DATED: December 20, 2018                    Respectfully submitted,

                                                           **COLE SCHOTZ P.C.**

By:_____*/s/ David M. Bass*_____
                Michael D. Sirota
                David M. Bass
                Rebecca W. Hollander
                Court Plaza North
                25 Main Street
                Hackensack, New Jersey 07601
                (201) 489-3000
                (201) 489-1536 Facsimile
                msirota@coleschotz.com
                dbass@coleschotz.com
                rhollander@coleschotz.com

                *Proposed Counsel to Debtor and*
                *Debtor-in-Possession*