*FILED*

JEANNE A. NAUGHTON, CLERK

# EFFY ZINKIN

JAN 10 2019

U.S. BANKRUPTCY COURT
NEWARK, N.J.

487 Harrison Avenue ◆ Highland Park, NJ 08904 ◆ 347.xxx.xxxx ◆ effyzinkin@gmail.com

BY _____ DEPUTY

January 9, 2019

Honorable Jack K. Sherwood
Martin Luther King, Jr. Federal Building
United States Courthouse
50 Walnut Street
Newark, NJ 07102

> Re:   *Icon Eyewear, Inc., Debtor in Possession*
> *Case #: 18-34902 (JKS)*
> *Objections to Pending Motions Returnable January 11, 2019*

Dear Honorable Sherwood,

I am the former president of Icon Eyewear, LLC ("Icon") having been hired on, or about, December 5, 2016. [See Exhibit A]. I was hired with a base salary of $375,000. I do not presently, and never had, an equity stake in Icon.

In January of 2018, the owners of Icon, Mike and Julie Chang (collectively, "the Changs") requested that I personally lend to each of them, as individuals, and Icon, as a company, (collectively, "the Borrowers"), the principle amount of $400,000. That amount is a very significant amount for me, and I did not have that type of money available. As such, upon the Changs' request, my wife, Devora Zinkin, and I secured a personal loan in our names, to relend to the Borrowers, in an amount equaling $400,000, of which we have, and we are continuing to, incur interest charges, set at Prime plus 1% (for an initial interest rate of 5.5%, which has since increased to 6.5%). [See Exhibit B]

The reason the Borrowers' requested a loan was that Icon was experiencing cash flow concerns due to the loss of a reader program from their largest customer, Costco, which represented almost 35% of Icon's business. Periodically the program was put up to bid, and Icon had submitted their bid for future years prior to my start date of employment with Icon. Icon was notified that they would not be awarded the go-forward program during my onboarding process, which time-period was while the former president was still at Icon.

Additional cash flow pressures mounted for Icon, due to several of its largest customers declaring bankruptcy in 2017-18, including but not limited to, Wet Seal, Gordmans, Vanity, Rue 21, Charming Charlie, National Stores, amongst others. While Icon was positioned, and being considered, for new large programs from a combination of existing and new retailer accounts, such programs – if awarded - would not commence until the end of the calendar year 2018 and/or 2019. In addition, such new programs would only be realized if Icon was continuing to perform through this period of financial distress.

1

Icon's lender, M&T Bank had refused to advance additional monies sufficient to cover Icon's ongoing expenses during this time period. The Changs were rightfully concerned that without sufficient funds to pay factories and other vendors, Icon would not be able to continue its existing programs or be positioned to realize turnaround efforts in the future.

The Changs committed to paying back the $400,000 loan within 6 months "at the latest". In fact, the Brorrowers executed a promissory note that was structured to have a step-up in interest from 12% to 18% after 6 months, to reflect the intended pay back after 6 months. [see Exhibit C]. My only request from the Changs, in addition to the documents securing the loan and interest, was a revised severance provision in my employment agreement, extending any severance from 12 months to 24 months. I stated to Michael Chang that my request was made to reflect my loan was being made due to a belief in the long term commitment of the Changs to myself in the turnaround process. I expressed repeatedly that the amount was very meaningful for me, and that I was taking out a loan myself to be able to help the Borrowers. The Borrowers each signed the promissory note, three (3) separate confessions of judgment [see Exhibit D], and Icon signed the amendment to my employment agreement on, or about, February 1, 2018 [see Exhibit E], the same day I transferred over the loan amount of $400,000. [see Exhibit F]

Three months later, M&T Bank inquired of Brian Liston, Icon's SVP of Finance, as to the source of the additional funds from February 1, 2018. Rather than viewing the injection of funds as a show of confidence, and a personal loan from an employee, M&T took the position that my loan to the Borrowers was an investment in Icon. M&T demanded that I must sign a subordination agreement, which would provide that my ability to be repaid from Icon would be materially worse than any vendor providing services – whether a box supply company or a trucker or whomever. If I refused to sign the subordination agreement, M&T declared they would find Icon in default of their loan agreement, and all Icon funding would be terminated immediately. Michael Chang called me to ask that I sign the subordination agreement immediately. I advised that I would like legal counsel to review any subordination agreement prior to my signing. Michael Chang was insistent that I sign the subordination agreement as is, as he was concerned they would lose the company immediately if I tried to negotiate changes or refused to sign. Moreover, we discussed and agreed that based on our plain reading of the subordination agreement [see Exhibit G] it appeared to each of us that the subordination agreement only applied to Icon, and not the obligations of Michael Chang or Julie Chang, as individuals. Michael Chang once again confirmed his, Julie Chang's and Icon's commitment to myself being part of Icon long term, and restated that they understood they had a personal obligation to make the payments, per the documents they signed.

As my money was already lent to Borrowers, and I was gravely concerned that the practical implication of my refusing to sign the subordination agreement would result in greater difficulty in collecting my loan from both Icon and the Changs, despite the clear lack of an arms-length negotiation, I signed the subordination agreement without change.

Six weeks later, in early June of 2018, the Changs approached me once again, insisting on renegotiating the First Amendment to my employment agreement that had been signed along with the loan. Despite

2

the fact that I had now signed the subordination agreement, they insisted on reducing my severance provision back to one year. I was caught in a terrible spot. There was now a subordination agreement in place making it more difficult for me to be repaid from Icon. If I refused their request to reduce my severance agreement, then I understood that despite any promissory note or confession of judgment, I could spend considerable time and monies trying to collect on my loan, and likely spend significant monies trying to collect on my severance agreement should they retaliate by terminating me.

As a result, with little choice, without due consideration, I agreed to renegotiate my severance provision under the condition that the principle loan plus interest was repaid in full by December 31, 2018. In that instance, I would still be entitled to two years severance if the termination occurred prior to December 31, 2022 (4 years from the payback deadline). Commencing December 31, 2022, I could be terminated with only one year severance. Michael Chang requested we refrain from a formal legal document, and instead, our discussion was memorialized in an email dated June 12, 2018. [see Exhibit H]

In early September of 2018, the Changs approached me once again. This time, however, they told me they were terminating me. Michael Chang explained that with the current downsizing of the business, Michael Chang could not afford to keep me, and "this was [his] last shot to make the company viable. If it would fail [he] wanted it to be with [him] in the driver's seat, and no one else." While I was extremely disappointed in light of both my efforts as an employee, but also because of how I had extended myself financially on the Borrowers' behalf, I recognized the Changs' were looking to reduce overhead and had the right to terminate me without cause, provided they honored the Severance provisions we had negotiated. I noted to Michael Chang that I would help him in any way he needed during the transition, and I also expected him to honor my employment agreement, which included the severance agreement. Michael Chang refused saying "you know I can't afford to do so." The Changs refused to honor my original employment agreement. The Changs refused to honor our amended employment agreement dated February 1, 2018. The Changs even refused to honor our discussion, memorialized by email, dated June 12, 2018. The Changs advised what they would agree to would be limited as follows:

1. Provided I was paid back my personal loan of $400,000, plus interest, by December 31, 2018, then:
    a. Icon would keep me employed, which would include reimbursement of all business expenses and other related benefits (e.g., health insurance, a personal life insurance payment of $3000 per month, car allowance, etc) through December 31, 2018.
    b. Thereafter I would receive Salary Continuance, without business expenses, from January 1, 2019 through March 31, 2019;

2. However, if my loan, plus interest, was not paid back by December 31, 2018, then:
    a. I would remain on payroll, including reimbursement of all business expenses and other related benefits, until my principle loan, plus interest, was paid in full.
    b. Once I was paid in full, at that point my Salary Continuance would extend, without reimbursement of expenses or other benefits, until the later of June 30, 2019 or for 3 months after my principle loan and interest were paid in full.

In all circumstances, health insurance, which I expressed during these discussions was a key provision in light of the fact that I am married with 4 dependent children, would be covered in full by the company up through 6 months from the date of final payment of my principle loan and interest.

We documented the Borrowers commitment in a handwritten note, which was witnessed and reviewed by Brian Liston, Icon's SVP of Finance.  [see Exhibit I]

Sure enough, two weeks later, Michael Chang called me up to state that he would not honor the above agreement either.  Michael Chang said that "all he could afford to do was pay me Salary Continuance until March 31, 2019.  Icon would only cover business expenses through September 30, 2018, although my Life Insurance payments would continue until December 31, 2018.
We formalized this "new" Separation Agreement in a document dated September 27, 2018.  [see Exhibit J]

Sure enough, despite submitting my business expenses for September a few weeks later, in the amount of $520.25 [see Exhibit K] Icon did not pay.  Despite the Separation agreement noting my life insurance payments would continue until December 31, 2018, Icon refused to pay for November or December.  I called Michael Chang, and he stated that finances continued to worsen but he would catch up.  He once again stated unambiguously he would make sure I was paid in full, and understood his and Julie Chang's personal obligations as well.

Then, on December 20, 2018, I received the notice from the bankruptcy court re Icon's filing.  I immediately called Michael Chang.  He said he "had to file".  He further stated that he was not filing personal bankruptcy, and in fact had reached an agreement with M&T to release a lien on his home.  Michael Chang further re-confirmed his understanding and commitment to paying back my personal loan, interest, and expenses.  I asked how, according to the bankruptcy filing, he was able to put in $730,000 to fund the business, but all these months he told me he did not have funds to pay back my loan, which monies was put into the company prior to the bankruptcy filing.  I asked how he managed to secure DIP financing, which seemed to come from him or an entity he owned, in the amount of $2,270,000 but for almost 11 months he had told me he did not have financing to pay back my loan.  He said he "raised the money from friends and family", and that he "had to use the funds raised to pay ongoing vendors first," but he would absolutely pay me back eventually.

Michael Chang then told me he was ceasing to pay my Salary Continuance.  Beyond dismayed, I expressed to Mr. Chang that he knew I was still unemployed.  He knew I was continuing to have to pay interest on the loan I took out on his, Julie Chang's and Icon's behalf.  He knew I had my continuing life insurance premium obligations.  Moreover, I said, according to the bankruptcy court documents I read, my understanding was that there was an application by Icon to continue paying wages.  My Separation Agreement provided my payments were Salary Continuance payments and, therefore, should be treated as wages the same as other employees.  IN ADDITION, Icon's own actions clearly indicate they continued to consider and treat me and associated compensation payments as that of an active employee.  This was evidenced when I called Icon's 401k provider, Vanguard, the day after I received the bankruptcy notice and inquired about withdrawing my 401k funds.  Vanguard advised that I couldn't withdraw my funds because only employees that depart can withdraw their funds, and Icon continues to treat me as an active employee up to, and including that very date.  Vanguard advised that since Icon had not notified them I was no longer employed, and even contributed to my 401k fund, I was still considered

4

employed.  This was consistent with the fact that payroll taxes, as well as health insurance premiums, were being deducted with each payroll check I received.

I am now in a very untenable position.  I have lent $400,000 to Michael Chang and Julie Chang, as individuals, as well as Icon as a corporation.  I borrowed this money to lend to the Borrowers, as I did not, and do not, have this much money to have lent without borrowing it myself.  I am now incurring my own interest payment obligations on a continuing basis.  I do not yet have another job.  M&T, along with Icon, strong-armed me into signing a subordination agreement as it relates to Icon.  If I am removed from payroll, it might also cause Icon to stop contributing to my health care premiums.  All I did was try to help Icon, the owners, and even the primary lendor, yet now I am now at risk of tremendous financial loss and crisis.

For all the reasons noted above, my application to the court is for an Order:

(A) Compelling Icon to continue my Salary Continuance payments, along with all business related expenses through September 30, 2018, and all associated benefits, enumerated under the Separation Agreement, dated September 27, 2018, as part of any Order issued under the Debtor's Motion (I) authorizing the debtor to (a) pay pre-petition wages and related obligations, (b) pay and remit payroll taxes and other deductions to third parties, and (c) honor and process worker's compensation and employee benefit obligation, and (ii) authorization and directing all banks to honor checks and transfers for payment of pre-petition employee obligations;

(B) Ensure that any DIP Financing  Ordered by the Court under the Debtor's motion for interim and final orders (1) approving post petition financings, (2) authorizing use of cash collateral, (3) granting liens and providing superiority administrative expense status, and (4) granting adequate protection, (5) modifying automatic stay, and (6) scheduling a final hearing that is approved, explicitly does NOT impair or prejudice any rights, claims or remedies I have against Michael Chang, or Julie Chang, individually, and all such rights, claims or remedies are hereby preserved.

(C) Treating the $730,000 invested into Icon by the Second Lien Lender, Three S Investments, LLC (now Five Comets, as assignee) the same as my $400,000 loan to Icon.  Should my loan be treated by M&T Bank and the Court as an investment into the company, not entitled to a secured interest against or in Icon, then the $730,000 investment by the Second Lien Lender into Icon should be treated in an identical manner.

Thank you for your time and attention.

Yours truly,

Ephraim Zinkin

cc:     Peter J. D'Auria, Office of the United States Trustee of the District of New Jersey
        Michael Sirota / David Bass / Rebecca Hollander, Law Firm of Cole Schotz, P.C.

# EXHIBIT A

November 16, 2016

Mr. Ephraim Z. Zinkin
487 Harrison Avenue
Highland Park, NJ 08904

Dear Mr. Zinkin:

Icon Eyewear, Inc. (the "Company") hereby employs you as its president subject to the following terms and conditions:

1.  Position; Duties.  You shall serve as the president and chief administrative officer of the Company reporting to Mike Chang, the Company's chief executive officer.  As president of the Company you shall be responsible for managing all aspects of the Company's business, subject to clearing major policy questions with Mike Chang.

2.  Term of Employment.  Your employment will commence on December 5, 2016 or such later date in December 2016 as agreed upon by you and Mike Chang.  Either you or the Company may terminate your employment at any time with or without cause.

3.  Base Salary.  The Company will pay you an annual salary of $375,000 per year ("Base Salary") during the term of your employment.

4.  Bonus.  The Company will pay you annual bonuses equal to 7% of the Company's annual pre-tax profits as determined by the Company's certified public accounting firm; provided, however, that for the year 2017, your bonus shall be the greater of 7% of the pre-tax profits for that year or $100,000.  The bonus earned for each calendar year shall be paid 50% in March and 50% in August of the following calendar year.

5.  Business Expenses.  The Company will pay your reasonable business expenses by reimbursement.

6.  Car Allowance.  The Company will pay you a car allowance of $1,200 per month plus your costs for gas, oil and tolls.

7.  Vacation.  You shall be entitled to four weeks annual paid vacation, plus Jewish holidays.

8.  Health Insurance.  The Company will pay 75% of the premiums under its major medical and hospitalization insurance plan for you and your eligible family members.  In addition, you and your family members shall be entitled to participate in the Company's dental and vision insurance plans, per the terms of Company's plan.

9.  Life Insurance.  The Company shall pay up to $36,000 per year in equal monthly installments to cover the cost of premiums on your personal life insurance.

10. <u>401(k) Plan</u>. You shall be entitled to participate in the Company's 401(k) Plan subject to its eligibility requirement of one year's service. Subject to federally mandated contribution limits, the Company will match your annual contributions to the Plan up to 4% of your Base Salary.

11. <u>Confidential Information</u>. During or after your employment, except as reasonably necessary or required during your employment, you shall not use or disclose any Confidential Information (as defined) to any individual or entity or retain copies, extracts or summaries thereof after termination of your employment. The provisions of this paragraph shall not apply to information which is generally known to the public or the eyewear industry, or that which was already known to you prior to November 1, 2016. As used in this Agreement, "<u>Confidential Information</u>" shall mean studies, plans, reports, surveys, analyses, sketches, drawings, specifications, notes, records, memoranda, computer-generated data, or documents, and all other nonpublic information relating to the business activities of the Company, including, without limitation, all methods, processes, formulas, techniques, equipment, research data, experiments, marketing and sales information, personnel data, customer lists, employee lists, supplier lists, financial data, trade secrets, and the like which presently or, in the future, are in the possession of the Company. Confidential Information may be in either human or computer readable form, including, but not limited to, software, source code, hex code, or any other form.

12. <u>Termination of Your Employment</u>. If the Company terminates your employment without cause, it shall continue to pay you your Base Salary and, if you elect to continue coverage under the Company's major medical and hospitalization plan, will also make 100% of your COBRA payments until the first to occur, (i) the expiration of 12 months from the date of termination of your employment or (ii) the date you accept new employment; provided, however, that if you accept new employment prior to the expiration of 12 months after termination of your employment, the Company shall continue to pay you 50% of your Base Salary during the balance of such 12 month period. If the Company terminates your employment for cause, the Company's sole liability will be to pay you your (i) Base Salary through the date of termination, (ii) accrued but unused vacation days, (iii) any unreimbursed business expenses incurred by you prior to such termination; and (iv) any prior year Bonus payments which you have earned but which remain unpaid as of the date of such termination. The Company shall pay you all such amounts in accordance to the terms such payments are typically made by the Company. For purposes of this Agreement, items (i) through (iv) shall be deemed "Accrued Amounts". A termination of your employment "<u>for cause</u>" shall be if the Company terminates your employment because of (i) your indictment of or plea of *nolo contendere* to a felony; or (ii) your intentional breach of your material duties under the Agreement. No act, or failure to act, on your part will be deemed "intentional" unless done, or omitted to be done, other than in good faith and without reasonable belief that your act, or failure to act, was in the best interest of the Company.

If you terminate your employment for any reason other than the Company's material breach of this Agreement and/or a material diminution of your responsibilities to a level not consistent with industry standard practice as it relates to the position of President (collectively referred to herein as "Company's Material Breach"), the Company's sole liability will be to pay you your Accrued Amounts through the date of termination. If you terminate your employment because of the Company's Material Breach, the Company shall pay you (i) your Accrued Amounts through the date of termination, (ii) a prorated Bonus for the year of termination, equal to the Bonus you would have been earned (if any) had you remained employed with the Company for the entire year of termination, and (iii) 100% of your COBRA payments until the earlier of 12 months from the date of termination of your employment or the date you accept new employment. Such payments shall be deemed full payment and discharge of any liability of the Company arising out of the Company's Material Breach. The Company shall pay you all such amounts in accordance to the terms such payments are typically made by the Company.

13. Non-Competition.  While you are employed by the Company and for twelve (12) months following the date of termination of your employment for any reason except the Company's Material Breach or your termination for any reason other than for cause, you shall not, directly or indirectly, (i) whether for compensation or not, own, manage, operate, control, be employed by, serve as a consultant to or otherwise participate in, any eyewear company; (ii) solicit any customers of the Company for any business enterprise which is competitive with the Company's then current business; or (iii) induce or attempt to induce any present or future employee of the Company to leave its employ.  The payments described in the first sentence of Section 12 shall be consideration for your agreements in this Section 13, if your employment was terminated by the Company without cause. No further consideration will be paid for your agreements in this Section 13, if your employment is terminated by the Company for cause or you terminate your employment for a reason other than the Company's Material Breach.

14. Governing Law.  This Agreement shall be governed by and construed in accordance with the law of the State of New Jersey without reference to that state's conflict of laws rules.

Please indicate your acceptance of this Agreement by signing in the space provided below for that purpose.

Very truly yours,

ICON EYEWEAR, INC.

By _____
    Mike Chang, CEO

ACCEPTED AND AGREED:

_____
EPHRAIM Z. ZINKIN

# EXHIBIT B

# Interest Rate Acknowledgement and Control Stock Disclosure

## STEP 1. ACCOUNT INFORMATION

LoanAdvance Account Number

| | | | | — | | | | | |

## STEP 2. RESTRICTED/CONTROL STOCK DISCLOSURE

1. Is the undersigned a control person of any publicly held organization?   ☐ Yes   ☑ No
2. Are any of the shares subject to a control provision?   ☐ Yes   ☑ No

**If you answered yes to question 2 above, please provide details below:**

| NUMBER OF SHARES | NAME OF COMPANY | SYMBOL |
|---|---|---|
| | | |
| | | |
| | | |

## STEP 3. INTEREST RATE ACKNOWLEDGEMENT

The undersigned ("Borrower") has executed a LoanAdvance Lending Agreement (the "Agreement") with Pershing LLC ("Pershing"). Pursuant to which Borrower has access to a line of credit collateralized by the value of securities held in Borrower's non-purpose LoanAdvance account or securities held in a separately managed account pledged by the Borrower (the "Account"). The Account is carried by Pershing as clearing broker pursuant to a clearing agreement between Pershing and your introducing firm. This Interest Rate Acknowledgement Form constitutes a supplement to the Agreement and shall be subject to and interpreted in accordance with the terms and conditions thereof.

The rate of interest charged on any credit extended in the Account is a floating rate based on the Prime Rate, which means that the rate will change from time to time. In addition, if you select the tiered interest rate option, the rate may be higher or lower in the future depending on the aggregate outstanding loan amount, and the change may be made without prior notice to Borrower. All rates described herein may be changed without prior notice to Borrower. In accordance with Paragraph 10 of the Agreement, however, the interest charged on any credit extended in the Account may not exceed a rate equal to 3 percentage points above the Prime Rate as published in *The Wall Street Journal*.

Subject to the foregoing, the rate of interest that will be charged on any credit extended in the Account is equal to the:

☑ Prime Rate __4.50__ %

Plus __1.00__ basis points

Initial Rate __5.5__ % per annum

☐ **Tiered Interest Rate.** As provided by my financial organization.

**THE INITIAL RATE WILL CHANGE AND MAY BE EITHER HIGHER OR LOWER IN THE FUTURE.**



IRDF

© 2014 Pershing LLC. Pershing LLC, member FINRA, NYSE, SIPC, is a wholly owned subsidiary of The Bank of New York Mellon Corporation (BNY Mellon). Trademark(s) belong to their respective owners.

## Interest Rate Acknowledgement and Control Stock Disclosure

Account Number |___|___|___|—|___|___|___|___|___|___|

### STEP 4. SIGNATURES

By signing below, Borrower acknowledges receipt of a completed copy of this Form, as well as any tiered interest rate schedule, if applicable. Borrower further acknowledges their understanding and acceptance of the terms disclosed herein and attests to the accuracy of the information provided.

**Primary Account Owner**

| Print Name<br>Ephraim Zinkin | Date |_|_—|_|_|_|—|_|_|_| |
|---|---|
| Signature<br>X | |

**Additional Account Owner**

| Print Name<br>Devora Zinkin | Date |_|_—|_|_|_|—|_|_|_| |
|---|---|
| Signature<br>X | |

**Additional Account Owner**

| Print Name | Date |_|_—|_|_|_|—|_|_|_| |
|---|---|
| Signature<br>X | |

**Additional Account Owner**

| Print Name | Date |_|_—|_|_|_|—|_|_|_| |
|---|---|
| Signature<br>X | |

**Entity (if a Business)**

| Print Name of Entity | Date |_|_—|_|_|_|—|_|_|_| |
|---|---|
| Title | |
| Authorized Signature<br>X | |

**FOR BROKER-DEALER USE ONLY**
The information below must be submitted for all LoanAdvance accounts, regardless of which interest rate index is selected. In addition, by signing below, the Branch Manager acknowledges that they have provided the Borrower with the Broker-Dealers tiered interest rate schedule, if applicable.

| Print Branch Manager Name | Date |_|_—|_|_|_|—|_|_|_| |
|---|---|
| Signature<br>X | |

©2014 Pershing LLC. Pershing LLC, member FINRA, NYSE, SIPC, is a wholly owned subsidiary of The Bank of New York Mellon Corporation (BNY Mellon). Trademark(s) belong to their respective owners.

# EXHIBIT C

# PROMISSORY NOTE

February 1, 2018

PRINCIPAL AMOUNT: $400,000

INTEREST: 12% per annum thru July 31, 2018, and 18% per annum thereafter

For value received, Michael Chang, an individual residing at _____, Julie Chang, an individual residing at _____, Icon Eyewear, Inc., a New Jersey corporation with offices at 5 Empire Blvd, South Hackensack, NJ 07606 ("Icon"), (Michael Chang, Julie Chang and Icon, collectively, and with joint and several liability hereunder, referred to as "Maker"), hereby unconditionally promises, to pay to the order of Ephraim Zinkin, an individual residing at 487 Harrison Ave., Highland Park, NJ 08904 (referred to herein as "Holder"), the principal sum of FOUR HUNDRED THOUSAND ($400,000), plus Interest equal to eighteen percent (18%) per annum (the Principal Amount and Interest collectively referred to herein as the "Loan Amount"), as follows:

1.  The obligations and liabilities of Michael Chang, Julie Chang, and Icon hereunder (collectively, "Maker") are and shall be joint and several in all respects.

2.  Commencing on February 1, 2018, and continuing until fully repaid, the principal balance of this Note shall bear interest at the rate of Twelve Percent (12%) per annum.  Interest shall be pre-paid on the first of every month, in the amount of $4000 (adjusted each month based on the then current Principle still owed on the last day of the previous month), commencing February 1, 2018 through July 31, 2018. Commencing August 1, 2018, Interest shall increase to Eighteen Percent (18%) per annum, on the existing Principle balance as of the last day of the previous calendar quarter.  Commencing August 1, 2018 and forward, Interest shall be pre-paid for three (3) months on the first day of each calendar quarter, in a single lump sum. There shall be no reduction or refund of interest payment if all, or a portion, of such then current principal payment is made before the next interest payment date, or if this Promissory Note is called by the Holder.

3.  The Principal Amount shall be paid in equal installments of $33,333.33 on the 1st of every month, commencing August 1, 2018.

4.  If any Loan Amount payment required to be made to Holder hereunder is delayed for any reason, interest shall accrue on the unpaid amount of such payment from and after the date on which the same became due at a rate equal to two percent (2%) per month or, if lower, the maximum rate of interest permitted under applicable law. Such interest shall be calculated daily at the aforesaid rate until payment is made in full by Maker.  Maker shall reimburse Holder any and all costs incurred by Holder in seeking to collect any sums due to him, including, without limitation, attorneys' fees,

and expenses and collection agency fees and expenses. The payment of interest in accordance with the terms of this Agreement is in addition to and not in lieu of all other remedies available to Holder in the event of a default.

5. Notwithstanding the foregoing, all unpaid interest and unpaid principal under this Note shall be paid to Holder by Maker within fifteen (15) days of written demand by Holder, but such demand shall not be made prior to August 1, 2018. For such purposes, written demand shall be deemed sufficient if delivered to Maker by either overnight delivery service and/or by email (mike@iconeyewear.com or Julie.c@iconeyewear.com).

6. Any payment of interest or principal shall be deemed paid when received by Holder.

7. This Note may be prepaid in whole or in part by Maker at any time without premium or penalty.

8. The Maker hereby waives presentment, diligence, demand for payment, protest, notice of dishonor, and any and all notices or demands in connection with the delivery, acceptance, performance, default or enforcement of this Promissory Note. No delay or omission by the Holder in exercising any rights hereunder or otherwise shall operate as waiver of any such right or of any other right of the Holder, nor shall any waiver by the Holder of any such right on any one occasion be deemed a bar to or waiver of such right or any other right on any other occasion.

9. The Maker's obligations hereunder shall be absolute and unconditional, shall not be subject to any setoff, counterclaim or crossclaim, and shall not be affected by any recharacterization (whether as equity or otherwise, whether in connection with a bankruptcy or insolvency proceeding or otherwise, and whether by order of a court, by any governmental agency or otherwise).

10. This Promissory Note shall be binding upon the Maker and the Maker's successors and assigns and the Maker may not assign or transfer any of its rights or obligations under this Note without the prior written consent of the Holder. The terms of this Note shall apply to, inure to the benefit of, and bind all parties hereto, their heirs, legatees, devisees, administrators, executors, personal representatives, successors, and assigns. Whenever used, the words "Maker" and "Holder" shall be deemed to include the respective heirs, legatees, devisees, administrators, executors, personal representatives, successors and assigns of Maker and Holder.

11. This Promissory Note shall be construed in accordance with and governed by the laws of the State of New Jersey without giving effect to the conflict of laws principals thereof. The Maker consents to the exclusive jurisdictions and venues of the state or federal courts located in the State of New Jersey. The Maker hereby waives personal service of any and all process upon it and consents that all such service of process may be made by email to mike@iconeyewear.com or Julie.c@iconeyewear.com and/or by overnight carrier and/or hand delivery to Maker at 5 Empire Blvd., South Hackensack, NJ 07606.

12. The provisions of this Note are severable, and the invalidity of unenforceability of any provision shall not alter or impair the remaining provisions of this Note.

13. This Promissory Note shall not be changed, modified, waived, discharged or terminated orally, but only by an agreement in writing signed by the party against whom enforcement of any change, modification, waiver, discharge or termination is sought.   The waiver of any covenant contained herein shall not be deemed to be a waiver of that covenant in the future or of any other covenant contained herein.  No failure of delay on the part of the Holder to exercise any right or remedy hereunder whether before or after the happening of a default shall constitute a waiver thereof, and no waiver of any past default shall constitute waiver of any future default or of any other default.  No failure to accelerate the debt evidenced hereby by reason of a default hereunder, acceptance of a past-due installment or interest, or indulgence granted from time to time, shall be constructed to be (a) be a waiver of the right to insist upon prompt payment thereafter, (b) be a revocation of this Note or waiver of debt evidenced hereby, (c) be a waiver of such right of acceleration or any other right, or (d) preclude the exercise of any right which Holder may have, whether by the laws of the State of New Jersey, by agreement or otherwise.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Maker has caused this Promissory Note to be duly executed and delivered as of the day and year first written above.

Michael Chang
Personally

By: _____
Name: Michael Chang


Sworn to before me this 30 day of January, 2018


_____
Notary Public

SAEHUI KIM
Notary Public - State of New Jersey
My Commission Expires Aug 8, 2021


Julie Chang
Personally

By: _____
Name: Julie Chang


Sworn to before me this 30th day of January, 2018


_____
Notary Public

SAEHUI KIM
Notary Public - State of New Jersey
My Commission Expires Aug 8, 2021


Icon Eyewear, Inc.
A New Jersey Corporation

By: _____
Name: Michael Chang
         Chief Executive Officer


Sworn to before me this 30 day of January, 2018


_____
Notary Public

SAEHUI KIM
Notary Public - State of New Jersey
My Commission Expires Aug 8, 2021


-4-

# EXHIBIT D

## CONFESSION OF JUDGMENT

MICHAEL CHANG, being duly sworn, deposes and says:

1.    I am an individual borrowing money from Ephraim Zinkin, and I am duly authorized to make this affidavit of confession of judgment.

2.    My primary residence is located at _34 Mountain Ridse Dr Livingston NJ 070*_

3.    This Affidavit of Confession of Judgment is for a debt justly due to Ephraim Zinkin ("Zinkin") arising out of a loan agreement between Zinkin and myself, dated February 1, 2018 (the "Promissory Note").

4.    The Promissory Note provides that I shall pay Zinkin (i) $400,000 ("Principal Amount"), and (ii) interest of 12% per annum through July 31, 2018; and commencing August 1, 2018 and thereafter 18% per annum ("Interest") (the Principal Amount and Interest herein collectively referred to as the "Loan Amount"), in full no later than July 31, 2019.

5.    The above Paragraph 4 notwithstanding, the Promissory Note further provides that (i) the Principal Amount shall be paid in equal installments of $33,333.33 on the 1st of every month, commencing August 1, 2018; (ii) Interest shall be pre-paid on the first of every month, in the amount of $4000 (adjusted each month based on the then current Principle still owed on the last day of the previous month), commencing February 1, 2018 through July 31, 2018; and (iii) commencing August 1, 2018 and thereafter, Interest shall increase to 18% per annum and will be pre-paid on the first of every calendar quarter based on the then current Principle owed on the last day of the previous calendar quarter.

6.    This Affidavit of Confession of Judgment may be used, disclosed, and filed under the circumstances provided in the Promissory Note, in addition to being triggered if Zinkin resigns or is terminated by Icon Eyewear, Inc., for any or no reason, with or without cause.

1

7.    ·I hereby make this Confession of Judgment, and in the event I fail to make any Payment as and when required under the Promissory Note, or immediately upon Zinkin's resignation or termination by Icon Eyewear, Inc., I authorize entry of judgment in any Court of Zinkin's choosing against I, and in favor of Zinkin, in the sum of $400,000, plus 12% interest per annum through July 31, 2018, and commencing August 1, 2018 and thereafter 18% interest per annum, less any and all payments made by I, Julie Chang or Icon Eyewear, Inc., in reduction of the Loan Amount under the Promissory Note.

8.    I hereby authorizes the entry of judgment so confessed in New Jersey, and any other jurisdiction, immediately upon the filing of an affidavit on behalf of Zinkin by him or his counsel demonstrating the failure to make any Payment as and when required under the Promissory Note, and the calculation of the amount of the judgment, after crediting I for the amounts of any and all payments made prior to the date of such affidavit, as required hereunder.

[Signature page follows]

2



By: Michael Chang, an individual

STATE OF NEW JERSEY        )

On the _1_ day of _February_ in the year 2018, before me, the undersigned personally appeared _Michael Chang_, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

NOTARY PUBLIC

SAEHUI KIM
Notary Public - State of New Jersey
My Commission Expires Aug 8, 2021

3

### CONFESSION OF JUDGMENT

JULIE CHANG, being duly sworn, deposes and says:

1.      I am an individual borrowing money from Ephraim Zinkin, and I am duly authorized to make this affidavit of confession of judgment.

2.      My primary residence is located at ___34 Mountain Ridge Dr Livingston, NJ 07039___

3.      This Affidavit of Confession of Judgment is for a debt justly due to Ephraim Zinkin ("Zinkin") arising out of a loan agreement between Zinkin and myself, dated February 1, 2018 (the "Promissory Note").

4.      The Promissory Note provides that I shall pay Zinkin (i) $400,000 ("Principal Amount"), and (ii) interest of 18% per annum ("Interest") (the Principal Amount and Interest herein collectively referred to as the "Loan Amount"), in full no later than July 31, 2019.

5.      The above Paragraph 4 notwithstanding, the Promissory Note further provides that (i) the Principal Amount shall be paid in equal installments of $33,333.33 on the 1st of every month, commencing August 1, 2018; (ii) Interest shall be pre-paid on the first of every month, in the amount of $4000 (adjusted each month based on the then current Principle still owed on the last day of the previous month), commencing February 1, 2018 through July 31, 2018; and (iii) commencing August 1, 2018 and thereafter, Interest shall increase to 18% per annum and will be pre-paid on the first of every calendar quarter based on the then current Principle owed on the last day of the previous calendar quarter.

6.      This Affidavit of Confession of Judgment may be used, disclosed, and filed under the circumstances provided in the Promissory Note, in addition to being triggered if Zinkin resigns or is terminated by Icon Eyewear, Inc., for any or no reason, with or without cause.

7.      I hereby make this Confession of Judgment, and in the event I fail to make any Payment as and when required under the Promissory Note, or immediately upon Zinkin's resignation or termination by Icon Eyewear, Inc., I authorize entry of judgment in any Court of Zinkin's choosing against I, and in favor of Zinkin, in the sum of $400,000, plus 12% interest per annum through July 31, 2018, and commencing August 1, 2018 and thereafter 18% interest per annum, less any and all payments made by I, Julie Chang or Icon Eyewear, Inc., in reduction of the Loan Amount under the Promissory Note.

8.      I hereby authorizes the entry of judgment so confessed in New Jersey, and any other jurisdiction, immediately upon the filing of an affidavit on behalf of Zinkin by him or his counsel demonstrating the failure to make any Payment as and when required under the Promissory Note, and the calculation of the amount of the judgment, after crediting I for the amounts of any and all payments made prior to the date of such affidavit, as required hereunder.


[Signature page follows]



By: Julie Chang, an individual

STATE OF NEW JERSEY          )

On the 1st day of February in the year 2018, before me, the undersigned personally appeared Julie Chang, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

NOTARY PUBLIC

SAEHUI KIM
Notary Public - State of New Jersey
My Commission Expires Aug 8, 2021

3

## CONFESSION OF JUDGMENT

ICON EYEWEAR, INC., being duly sworn, deposes and says:

1.      I am the Chief Executive Officer of Icon Eyewear, Inc. ("Icon"), and I am duly authorized to make this affidavit of confession of judgment on behalf of Icon Eyewear, Inc. in relation to their borrowing of money from Ephraim Zinkin.

2.      Icon's primary place of business is located at 5 Empire Blvd., South Hackensack, NJ 07606.

3.      This Affidavit of Confession of Judgment is for a debt justly due to Ephraim Zinkin ("Zinkin") arising out of a loan agreement between Zinkin and Icon, dated February 1, 2018 (the "Promissory Note").

4.      The Promissory Note provides that I shall pay Zinkin (i) $400,000 ("Principal Amount"), and (ii) interest of 18% per annum ("Interest") (the Principal Amount and Interest herein collectively referred to as the "Loan Amount"), in full no later than July 31, 2019.

5.      The above Paragraph 4 notwithstanding, the Promissory Note further provides that (i) the Principal Amount shall be paid in equal installments of $33,383.33 on the 1st of every month, commencing August 1, 2018; (ii) Interest shall be pre-paid on the first of every month, in the amount of $4000 (adjusted each month based on the then current Principle still owed on the last day of the previous month), commencing February 1, 2018 through July 31, 2018; and (iii) commencing August 1, 2018 and thereafter, Interest shall increase to 18% per annum and will be pre-paid on the first of every calendar quarter based on the then current Principle owed on the last day of the previous calendar quarter.

6.      This Affidavit of Confession of Judgment may be used, disclosed, and filed under the circumstances provided in the Promissory Note, in addition to being triggered if Zinkin resigns or is terminated by Icon Eyewear, Inc., for any or no reason, with or without cause.

7.      I hereby make this Confession of Judgment, and in the event I fail to make any Payment as and when required under the Promissory Note, or immediately upon Zinkin's resignation or termination by Icon Eyewear, Inc., I authorize entry of judgment in any Court of Zinkin's choosing against I, and in favor of Zinkin, in the sum of $400,000, plus 12% interest per annum through July 31, 2018, and commencing August 1, 2018 and thereafter 18% interest per annum, less any and all payments made by I, Julie Chang or Icon Eyewear, Inc., in reduction of the Loan Amount under the Promissory Note.

8.      Icon hereby authorizes the entry of judgment so confessed in New Jersey, and any other jurisdiction, immediately upon the filing of an affidavit on behalf of Zinkin by him or his counsel demonstrating the failure to make any Payment as and when required under the Promissory Note, and the calculation of the amount of the judgment, after crediting I for the amounts of any and all payments made prior to the date of such affidavit, as required hereunder.

[Signature page follows]

2



By: Michael Chang
CEO of Icon Eyewear, Inc.

STATE OF NEW JERSEY        )

On the _1_ day of _February_ in the year 2018, before me, the undersigned personally appeared _Michael Chang_, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

NOTARY PUBLIC

SAEHUI KIM
Notary Public - State of New Jersey
My Commission Expires Aug 8, 2021

3

# EXHIBIT E

February 1, 2018

Mr. Ephraim Z. Zinkin
487 Harrison Avenue
Highland Park, NJ 08904

Dear Mr. Zinkin:

This First Amendment, dated February 1, 2018, amends the Employment Agreement, dated November 16, 2016, between Icon Eyewear, Inc., a New Jersey corporation, with its primary place of business at 5 Empire Blvd., South Hackensack, NJ 07606 ("Icon") and Ephraim Zinkin, an individual, with a primary residence of 487 Harrison Ave., Highland Park, NJ 08904 ("Zinkin" or "You").

WHEREAS, the Icon and Zinkin mutually desire to amend the Employment Agreement to modify certain terms as relating to Zinkin's Bonus and Termination of Employment, with all other provisions of the Employment Agreement to remain unchanged.

NOW THEREFORE, in consideration of the promises and mutual covenants and undertakings hereinafter set forth, the parties agree that:

Paragraph 4 in the Employment Agreement is hereby amended and replaced with the following (which is identical to the previous Bonus provision of the Employment Agreement other than the underlined verbiage below which is hereby added):

> Bonus. The Company will pay you annual bonuses equal to 7% of the Company's annual pre-tax profits as determined by the Company's certified public accounting firm; provided, however, that for the year 2017, your bonus shall be the greater of 7% of the pre-tax profits for that year or $100,000. The bonus earned for each calendar year shall be paid 50% in March and 50% in August of the following calendar year. The previous sentence notwithstanding, the $100,000 earned for the calendar year 2017 shall be paid 50% in March 2019, and 50% in August 2019 (which shall be the same timing for the payment of Your 2018 bonus payments).

Paragraph 12 in the Employment Agreement is hereby amended as follows, with all other provisions from the Employment Agreement, Paragraph 12, hereby remaining unchanged:

1,    All references to "12 months" are hereby replaced with "24 months".

2.    If the Company terminates your employment without cause, it shall continue to make all payments detailed in the Employment Agreement, plus all Accrued Amounts.

3.    In addition to any and all other payment, or other, provisions in Paragraph 12 of the Employment Agreement, plus payment or other obligations as hereby amended, should You resign or the Company terminate you for any or no reason, with or without cause, all payment

obligations under the Promissory Note and Confession of Judgment, dated February 1, 2018, shall become immediately due and owing to You.

Please indicate your acceptance of this Agreement by signing in the space provided below for that purpose.

Very truly yours,

ICON EYEWEAR, INC.

By _____
Mike Chang, CEO

ACCEPTED AND AGREED:

_____
EPHRAIM Z. ZINKIN

# EXHIBIT F

# Wire Transfer Services

Outgoing Wire Transfer Request



**WELLS FARGO**

| | |
|---|---|
| Today's Date: | Wells Fargo Reference Number: |
| 02/02/2018 | FW0067731033136842 |
| Banker Name: | Officer/Portfolio Number: |
| AMY MORALES | A6321 |

| Banker Phone: | Branch Number: | Banker AU: | Banker MAC: |
|---|---|---|---|
| 201/994-0022 | 08864 | 0067731 | J2130-010 |

Outgoing wires can only be sent for Wells Fargo customers. Provide the Customer Copy to the customer ensuring you give them the Wire Transfer Agreement on pages 3 and 4. Note: Wells Fargo Wire Transfer Services will route wires based on correspondent banking relationships. See the Wire Transfer Information for explanations of the Mexican CLABE number, the SWIFT BIC, the International Routing Code ("IRC") , Indian Financial System Code (IFSC) and the International Bank Account Number ("IBAN").

## Originator's Information

| | |
|---|---|
| Originator Name: | Street Address: |
| EPHRAIM Z ZINKIN | 487 HARRISON AVE |
| Primary ID Type: | Primary ID Description: | Address Line 2: |
| PINV | PIN Validation | |
| Primary ID St/Cnty/Prov: | Primary ID Issue Date: | Primary ID Expiration Date: | Address Line 3: |

| Secondary ID Type: | Secondary ID Description: | City: | State: |
|---|---|---|---|
| DLIC | Z4504 23089 03712 | HIGHLAND PARK | NJ |
| Secondary ID State/Country: | Secondary ID Issue Date: | Secondary ID Expiration Date: | ZIP/Postal Code: | Country: |
| NJ | 02/27/2015 | 04/30/2019 | 08904-2707 | US |
| | | | Home Phone: | Business Phone: |
| | | | 732/572-4543 | |

## Wire Amount and Source of Funds

| Create AU: | Amount (US Dollars): | Debit Wells Fargo Account: | Bank/COID: |
|---|---|---|---|
| 0067731 | $400,000.00 | 3000025472021 | 00347 |

## Beneficiary/Recipient Information (This is the ultimate recipient of the wire transfer funds)

| | |
|---|---|
| Beneficiary/Recipient Name: | Name/Address Line 1: |
| Icon Eyewear, INC | |
| Beneficiary Account Number/IBAN (Foreign)/CLABE (Mexico): | Name/Address Line 2: |
| 9857697388 | |
| Purpose of Funds: | Name/Address Line 3: |
| ICON Loan | |
| | Beneficiary Phone Number: |
| Additional Instructions: | |

$15 incoming wire fee
$30 wire transfer fee ⊅ MQT



WTR6603 (8-17 SVP)

Wire Transfer Services Outgoing Wire Transfer Request

## Beneficiary Bank (This is the financial institution where the beneficiary maintains their account.)

| ABA/RTN | SWIFT/BIC: | Beneficiary Bank Name: | | |
|---|---|---|---|---|
| 022000046 | | MANUFACTURERS  TRADERS  TRUST  CO | | |
| Beneficiary Bank Address: | | City: | State: | |
| | | BUFFALO | NY | |
| Additional Instructions: | | | | |
| | | | | |

## Wire Fees

Wells Fargo wire transfer fees will be charged to the Originator's Debit Account. Wells Fargo Wire Transfer Fees are disclosed in your most recent Fee and Information Schedule and related amendments and, if applicable, on the Wells Fargo Combined Disclosure for Outgoing Consumer International Wires. Additional fees from intermediary and beneficiary banks may be charged to international transactions. My signature here indicates agreement to all of the information on this Outgoing Wire Transfer Request and to the terms and conditions of this request. Wells Fargo is authorized to rely on the information on this Request in making the requested funds transfer.

## Customer Signature

Originator Name

EPHRAIM Z ZINKIN

Originator Signature

☐ Submit manually
☐ Signature not required

Date:
02/02/2018

Customer Copy

WTR6603 (8-17 SVP)

Wire Transfer Services Outgoing Wire Transfer Request

**Agreement For Outgoing Wire Transfer Requests ("Wire Transfer Agreement")**

**Responsibility of Wells Fargo.** The wire transfer described in the Outgoing Wire Transfer Request (Page 1) ("Order") may be sent by wire telegraph, telephone, cable or whatever other transmission method Wells Fargo considers to be reasonable. The wire transfer may be transmitted directly to the Beneficiary Bank (the financial institution designated in the Request as the Beneficiary Bank), or indirectly to the Beneficiary Bank through another bank, government agency, or other third party that Wells Fargo considers to be reasonable. Wells Fargo may utilize any funds transfer system or intermediary bank reasonably selected by Wells Fargo, even if its selection differs from instructions in the request.

**Agent.** Wells Fargo may use agents of its choice to perform any of its obligations.

**Limitation of Liability.** Wells Fargo will not be liable for any loss or damage due to the failure, delay, or error of: (1) the method of transmission selected by Wells Fargo, (2) a third party selected by Wells Fargo to receive the Order, or (3) the Beneficiary Bank. IN NO EVENT WILL WELLS FARGO BE LIABLE FOR DAMAGES ARISING DIRECTLY OR INDIRECTLY IF THE ORDER IS EXECUTED BY WELLS FARGO IN GOOD FAITH AND IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT. REGARDLESS OF THE FORM OR NATURE OF ANY CLAIM OR ACTION, IN NO EVENT WILL WELLS FARGO BE LIABLE FOR PUNITIVE, INCIDENTAL OR CONSEQUENTIAL DAMAGES, WHETHER OR NOT WELLS FARGO SHALL HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**Reliance on Information Provided.** You acknowledge that you are responsible for providing Wells Fargo with all information required by the Beneficiary's bank, including the reason for payment, if required. Sending wires without the required information can cause the wire to be delayed, returned, or assessed additional fees. If a wire transfer request describes the person to receive the wire transfer ("Beneficiary") inconsistently by name and account number, the wire transfer may be made on the basis of the account number even if the account number identifies a person different from the Beneficiary. If a wire transfer request describes a financial institution inconsistently by name and identification number, the identification number may be relied upon as the proper identification of the financial institution.

**International Wire Transfers.** A Payment Order expressed in U.S. Dollars will be sent in U.S. Dollars. Company may request that prior to executing a Payment Order, Wells Fargo convert the amount to be transferred from U.S. Dollars to the currency of a designated foreign government or intergovernmental organization ("Foreign Currency") at Wells Fargo's sell rate for exchange in effect on the date Wells Fargo executes the Payment Order. If the financial institution designated to receive the funds does not pay the beneficiary specified in a Payment Order payable in Foreign Currency and the funds are returned to Wells Fargo, Wells Fargo will not be liable for a sum in excess of the value of the funds after they have been converted from Foreign Currency to U.S. Dollars at Wells Fargo's buy rate for exchange at the time the cancellation of the Payment Order is confirmed by Wells Fargo. Wells Fargo will not be liable for any failure or delay by any financial institution or other third party in the designated foreign country in executing or failing to execute any Payment Order Wells Fargo transmits to a foreign country.

**Refund.** If the Beneficiary Bank does not pay the Beneficiary specified on the Order, a refund will be made only after Wells Fargo has received confirmation of the effective cancellation of the Order and Wells Fargo is in free possession of the funds debited or earmarked in connection with the Order. If the order is payable in Foreign Currency, Wells Fargo will not be liable for a sum in excess of the value of the Order after it has been converted from Foreign Currency to U.S Dollars at Wells Fargo's buying rate for exchange at such time as the cancellation of the Order is confirmed by Wells Fargo.

**Failure to Transfer Proper Amount.** If Wells Fargo is notified that it did not transfer the full amount stated in the Request, Wells Fargo's sole liability will be to promptly execute a second Payment Order in the amount of the stated deficiency. If Wells Fargo executes an instruction in excess of the amount stated in the Request, to the extent that the originator does not receive the benefit of the Order, Wells Fargo will only be liable for any loss of the principal amount transferred in excess of the amount stated in the Request instructions. Additionally, Wells Fargo will be liable for the amount of interest the originator has lost due to the transfer of the excess amount, computed at the then current Federal Funds rate. However, Wells Fargo's liability for loss of interest shall be limited to twenty (20) calendar day's interest. This section sets forth Wells Fargo's complete liability for the order issued under this agreement.

**Finality of orders.** The order will be final and will not be subject to stop payment or recall, except that Wells Fargo may, at the originator's request, make an effort to effect such stop payment or recall. In such case, Wells Fargo will incur no liability for its failure or inability to do so.

**Fees.** In addition to the outgoing wire transfer fee, additional fees may apply. Additional fees can include, but are not limited to: an additional fee for bank initiated transactions, amendment fees, statement fees, fees assessed by beneficiary and intermediary banks, etc. On international outgoing wires, if a SWIFT BIC, IRC, IBAN, or CLABE number is not provided the foreign banks may return the wire or assess a surcharge. Wells Fargo Wire Transfer Fees are disclosed in your most recent Fee and Information Schedule and related amendments.

**Acts of God.** Wells Fargo is excused for delays or failure to execute the Order to the extent that the delay or failure results from a cause beyond the reasonable control of Wells Fargo.

## Wire Transfer Information

**General Information: You can NOT have a bank as the final beneficiary,** unless the wire is a payment to Wells Fargo (i.e.: mortgage, auto loan, etc.). We are required to know who the money is going to, to ensure the funds are not being used to support terrorist or drug activity. We need an account number for the beneficiary OR a complete physical address. No PO Boxes may be used when no account number is provided for the Beneficiary.

**International Wires:** Wires going to foreign countries require different numbers depending on the receiving foreign country. All wire transfer payments destined for Europe should include the SWIFT Bank Identifier Code (SWIFT BIC), International Routing Code (IRC) as applicable, and for participating countries the beneficiary's International Bank Account Number (IBAN). Mexican banks may require a CLABE number in addition to the SWIFT BIC.

1. **SWIFT** Bank Identifier Code (SWIFT BIC). The 8 or 11 character SWIFT BIC is a unique series of alpha numeric characters that help to identify a specific financial institution. The SWIFT BIC should be obtained from the beneficiary. To ensure timely delivery please be sure that international outgoing wires include the SWIFT BIC where applicable.

2. **International Routing Code (IRC):** Some countries throughout the international banking community have created international routing codes, which are used in combination with the SWIFT BIC to aid in routing the payment through a main office to a branch. Each country has a specific name for their routing code (i.e., Sort Code in the United Kingdom, Canadian Payments Association Routing Numbers in Canada). Your beneficiary must provide the international routing code to facilitate receipt of an international payment. Sending a wire without the IRC number can delay the wire, or the receiving bank may return the wire when this number is not included in the payment instructions, and additional fees may be assessed.

3. **International Bank Account Number (IBAN):** The IBAN varies by country/institution. Warning! Only the bank servicing an account can provide the correct IBAN of that account and must be obtained from the beneficiary of the wire. Sending a wire to a participating country without the IBAN can delay the wire, or the receiving bank may return the wire when the IBAN is not included in the payment instructions, and additional fees may be assessed.



WTR6603 (8-17 SVP)

Wire Transfer Services Outgoing Wire Transfer Request

Participating Countries that require an IBAN:

| | | | | | |
|---|---|---|---|---|---|
| Albania | Denmark | Guadeloupe | Liechtenstein | Norway | Slovak Republic |
| Andorra | Dominican Republic | Guatemala | Lithuania | Pakistan | Slovenia |
| Austria | Estonia | Hungary | Luxembourg | Palestine (State of) | Spain |
| Azerbaijan (Republic of) | Faroe Islands | Iceland | Macedonia | Poland | Sweden |
| Bahrain | Finland | Ireland (Republic of) | Malta | Portugal | Switzerland |
| Belgium | France | Isle of Man | Martinique | Qatar | Timor-Leste |
| Bosnia and Herzegovina | French Guiana | Israel | Mauritania | Reunion Island | Tunisia |
| Brazil | French Polynesia | Italy | Mauritius | Romania | Turkey |
| Bulgaria | French Southern Territories | Jordan | Mayotte | Saint Barthelemy | United Arab Emirates |
| Channel Islands | Georgia | Kazakhstan | Moldova (Republic of) | Saint Martin | United Kingdom |
| Costa Rica | Germany | Kosovo (Republic of) | Monaco | Saint Pierre et Miquelon | Virgin Islands, British |
| Croatia | Gibraltar | Kuwait | Montenegro | San Marino | Wallis and Futuna Islands |
| Cyprus | Greece | Latvia | Netherlands | Saudi Arabia | |
| Czech Republic | Greenland | Lebanon | New Caledonia | Serbia | |

4. **Indian Financial System Code (IFSC):** Every Indian bank has a unique eleven (11) character alpha numeric code identifying the bank branch to receive the wire transfer. To ensure timely delivery, please be sure that international outgoing wires include the IFSC where applicable.

5. **Mexico CLABE Account Number:** Mexican banks may require an 18 digit CLABE account number be added to the Beneficiary instructions to ensure payment. The CLABE number may be required on Mexican Peso (MXN) and USD payments sent to Mexico. The CLABE account number must be obtained from the beneficiary. Wells Fargo does not provide or calculate the CLABE. Sending a wire without a CLABE account number can delay the wire, or the receiving bank may return the wire if the CLABE is not included in the payment instructions, and additional fees may be assessed.

6. **Wells Fargo recommends** that if you do not have a SWIFT BIC, IBAN, IFSC, IRC, or Mexican CLABE number, that you contact the beneficiary of the wire. If the beneficiary does not have the needed information, please have the beneficiary contact their bank to obtain the appropriate information. Sending International wires without the required information can cause the wire to be delayed, returned, or assessed additional fees. For International outgoing wires only: When sending in foreign currency, please ensure the beneficiary's account accepts the designated foreign currency. International foreign currency wires are *generally* less expensive to send as compared with International USD wires (the Wells Fargo wire fee is always less when the wire is sent in foreign currency and Wells Fargo does not charge a converting fee; we also offer competitive exchange rates.)



WTR6603 (8-17 SVP)



**Hornor Townsend & Kent, Inc.**
600 Dresher Road ■ Suite C1C
Horsham, PA 19044 ■ 800-873-7637

000643  XP196DD1

EPHRAIM ZINKIN
DEVORA ZINKIN JT TEN
NON PURPOSE LOAN ACCOUNT
487 HARRISON AVE
HIGHLAND PARK NJ 08904-2707

## Fed Funds Wire Transfer

February 2, 2018
Account Number: 40U-XXXX09
Registered Representative: Borger/Clark

---

Please review the following **Fed Funds Wire Transfer** from your account.

| Date | Sent to | Amount |
|------|---------|--------|
| 02/01/2018 | WELLS FARGO BANK, NA | $400,000.00 |

HORNOR TOWNSEND & KENT provides this notice to you as added security in the event that you did not authorize the transfer or if the details regarding the transaction are incorrect.

Please contact us at the above address or telephone number with any questions that you may have regarding this transaction.

000643  XP196DD1  000682

Clearing through Pershing LLC, a wholly owned subsidiary of The Bank of New York Mellon Corporation (BNY Mellon).
Pershing LLC, member FINRA, NYSE, SIPC

# EXHIBIT G

**M&T** Bank

# GENERAL SUBORDINATION AGREEMENT
## New Jersey

DATE: May _____, 2018

**CREDITOR:** Ephraim Zinkin, an individual whose principal place of residence is 487 Harrison Avenue, Highland Park, NJ 08904.

**LENDER:** M&T Bank, a New York banking corporation with banking offices at One M&T Plaza, Buffalo, New York 14203. Attention: Office of General Counsel

**BORROWER:** ICON Eyewear, Inc., a New Jersey corporation whose principal place of business/residence is 5 Empire Boulevard, South Hackensack, NJ 07606.

1.  **Subordination.**  Creditor, for value received, and intending to be legally bound, hereby subordinates, for the benefit of Lender, the Subordinated Obligations (defined below) to the Primary Obligations (defined below) and agrees to the other provisions of this Agreement. The provisions of this Agreement shall remain effective and enforceable against Creditor regardless of the enforceability of the Primary Obligations.

    a.  "Primary Obligations" means collectively, any and all obligations owed by Borrower to Lender, whether now existing or hereafter incurred, of every kind and character, whether such obligations are from time to time reduced and thereafter increased, or entirely extinguished and thereafter reincurred, whether direct, indirect, primary, absolute, secondary, contractual, tortious, liquidated, unliquidated, contingent, secured, unsecured, matured or unmatured, by guarantee or otherwise including, without limitation: (i) obligations not yet outstanding, but contracted for, or with respect to which any other commitment by Lender exists; (ii) all interest provided for in any instrument, agreement or applicable law which accrues on any obligations; (iii) any obligations incurred prior to, during or after any filing by or against Borrower or any petition or request for liquidation, reorganization, arrangement, adjudication as a bankrupt, relief as a debtor, or other relief under bankruptcy, insolvency, or similar laws now or hereafter in effect in the United States of America or any state or territory thereof or any foreign jurisdiction, notwithstanding Borrower's legal status as a debtor or a debtor-in-possession or Borrower's discharge in any such proceeding, including, without limitation, any post-petition interest which may accrue on such obligations and whether or not all, or any part of, such obligations (including, without limitation, post-petition interest) is an allowable claim; (iv) all fees and costs (including, without limitation, actual attorneys' fees and disbursements whether for internal or outside counsel) Lender incurs in order to collect any amount due by Borrower, to negotiate or document a workout or restructuring, or to preserve its rights or realize upon any guaranty or other security for the payment of any amount due by Borrower to Lender; and (v) any sums owed by Borrower to others which Lender has obtained, or may obtain, by assignment or otherwise.

    b.  "Subordinated Obligations" means collectively, any and all obligations owed by Borrower to Creditor whether now existing or hereafter incurred of every kind and character, whether such obligations are from time to time reduced and thereafter increased, or entirely extinguished and thereafter reincurred, whether direct, indirect, primary, absolute, secondary, contractual, tortious, liquidated, unliquidated, contingent, secured, unsecured, matured or unmatured, by guarantee or otherwise including, without limitation: (i) the obligations described on Schedule A and all extensions, renewals or modifications thereof; (ii) obligations not yet outstanding, but contracted for, or with respect to which any other commitment by Creditor exists; (iii) all interest provided in any instrument, agreement or applicable law which accrues on any obligations; (iv) any obligations incurred prior to, during or after any filing by or against Borrower or any petition or request for liquidation, reorganization, arrangement, adjudication as a bankrupt, relief as a debtor, or other relief under bankruptcy, insolvency, or similar laws now or hereafter in effect in the United States of America or any state or territory thereof or any foreign jurisdiction, notwithstanding Borrower's legal status as a debtor or a debtor-in-possession or Borrower's discharge in any such proceeding, including, without limitation, any post-petition interest which may accrue on such obligations and whether or not all, or any part of, such obligations (including, without limitation, post-petition interest) is an allowable claim; (v) all fees and costs (including, without limitation, actual attorneys' fees and disbursements whether for internal or outside counsel) Creditor incurs in order to collect any amount due by Borrower, to negotiate or document a workout or restructuring, or to preserve its rights or realize upon any guaranty or other security for the payment of any amount due by Borrower to Creditor; and (vi) any sums owed by Borrower to others which Creditor has obtained, or may obtain, by assignment or otherwise.

2.  **Payments on Subordinated Obligations.**  Creditor shall have the right to receive the following payments (but not prepayment) on the Subordinated Obligations listed on Schedule A unless and until Lender notifies Creditor or Borrower that an Event of Default (defined below) has occurred (check applicable box(es)):

☐   Any payment made in cash and consisting of regularly scheduled payments of **interest** accruing after the date of this Agreement with respect to the Subordinated Obligations listed on Schedule A or with respect to any portion thereof in accordance with the terms of any instrument in effect as of the date hereof and disclosed to Lender in accordance with the terms of this Agreement, which evidences the Subordinated Obligations listed on Schedule A. Payment of accrued interest must be made when due under the terms of any such instrument evidencing the applicable Subordinated Obligation listed on Schedule A. Interest payable on demand is not a "regularly scheduled payment" in this context.

☐   Any payment made in cash and consisting of regularly scheduled installments of **principal** (other than "balloon" payments at maturity) coming due after the date of this Agreement with respect to the Subordinated Obligations listed on Schedule A or with respect to any portion thereof in accordance with the terms of any instrument in effect as of the date hereof and disclosed to Lender in accordance with the terms of this Agreement, which evidences the Subordinated Obligations listed on Schedule A. Payment of such principal installments must be made when due under the terms of any such instrument evidencing the applicable Subordinated Obligation listed on Schedule A. Amounts payable on demand are not "regularly scheduled installments" in this context.

☐   Any payment made in cash and consisting of regularly scheduled installments of principal of the Subordinated Obligations listed on Schedule A or any portion thereof, so long as, immediately after the acceptance of such payment by Creditor, the outstanding principal amount of the Subordinated Obligations listed on Schedule A total no less than $_____.

☒   See Schedule B, attached hereto and made a part hereof.

© M&T Bank, 2012

(If no box is checked, no payments of either principal, interest or any other amounts are permitted at any time either before or after such notice of an Event of Default.) If there are any Subordinated Obligations not listed on Schedule A, Creditor is not permitted to receive any payment thereunder (either before or after an Event of Default), notwithstanding that payments may be permitted under the Subordinated Obligations listed on Schedule A. Following Lender providing Creditor with notice of an Event of Default, Creditor shall not demand or receive any payments of principal, interest or any other amounts on the Subordinated Obligations listed on Schedule A or any part thereof while this Agreement is in effect without the prior written consent of Lender. If there are any Subordinated Obligations not listed on Schedule A, Creditor shall not demand or receive payments of principal or interest under such Subordinated Obligations even if payments are being allowed under the Subordinated Obligations listed on Schedule A. If Creditor receives any payments in violation of this paragraph or any other provision in this Agreement, Creditor will hold such payments in trust for Lender in the same medium in which received, will not commingle the same with any of the assets of Creditor, and will deliver the same to Lender in the form received, properly endorsed to permit collection, not later than the next business day following the day of their receipt. Nothing herein shall require the Lender to accelerate or demand (as the case may be) payment of the Primary Obligations or exercise any other right or remedy against Borrower or any other person upon or after an Event of Default in order to exercise its rights under this Agreement.

3.    **Event of Default.** Any of the following events or conditions shall constitute an "Event of Default": (i) failure by Borrower to pay when due (whether at the stated maturity, by acceleration, upon demand or otherwise) the Primary Obligations, or any part thereof, or there occurs any event or condition which after notice, lapse of time or after both notice and lapse of time will permit acceleration of any Primary Obligation; (ii) default by Borrower in the performance of any obligation, term or condition of any agreement with Lender or any of its affiliates or subsidiaries (collectively, "Affiliates"); (iii) failure by Borrower to pay when due (whether at the stated maturity, by acceleration, upon demand or otherwise) any indebtedness or obligation owing to any third party or any Affiliate, the occurrence of any event which could result in acceleration of payment of any such indebtedness or obligation or the failure to perform any agreement with any third party or any affiliate; (iv) Borrower is dissolved, becomes insolvent, generally fails to pay or admits in writing its inability generally to pay its debts as they become due; (v) Borrower makes a general assignment, arrangement or composition agreement with or for the benefit of its creditors or makes, or sends notice of any intended, bulk sale; the sale, assignment, transfer or delivery of all or substantially all of the assets of Borrower to a third party; or the cessation by Borrower as a going business concern; (vi) Borrower files a petition in bankruptcy or institutes any action under federal or state law for the relief of Borrower or seeks or consents to the appointment of an administrator, receiver, custodian or similar official for the wind up of its business (or has such a petition or action filed against it and such petition action or appointment is not dismissed or stayed within forty-five (45) days); (vii) the reorganization, merger, consolidation or dissolution of Borrower (or the making of any agreement therefor); (viii) the death or judicial declaration of incompetency of Borrower, if an individual; (ix) the entry of any judgment or order of any court, other governmental authority or arbitrator against Borrower; (x) falsity, omission or inaccuracy of facts submitted to Lender or any Affiliate (whether in a financial statement or otherwise); (xi) an adverse change in Borrower, its business, operations, affairs or condition (financial or otherwise) from the status shown on any financial statement or other document submitted to Lender, and which change Lender determines will have a material adverse effect on (a) Borrower, its business, operations or condition (financial or otherwise), or (b) the ability of Borrower to pay or perform the Primary Obligations; (xii) any pension plan of Borrower fails to comply with applicable law or has vested unfunded liabilities that, in the opinion of Lender, might have a material adverse effect on Borrower's ability to repay its debts; (xiii) any indication or evidence received by Lender that Borrower may have directly or indirectly been engaged in any type of activity which, in Lender's discretion, might result in the forfeiture or any property of Borrower to any governmental authority; (xiv) the occurrence of any event described in Section 3(i) through and including 3(xiii) with respect to Creditor or any endorser, guarantor or any other party liable for, or whose assets or any interest therein secures, payment of any of the Primary Obligations; or (xv) Lender in good faith deems itself insecure with respect to payment or performance of the Primary Obligations.

4.    **Pledge.** Creditor does hereby transfer and assign to Lender the Subordinated Obligations along with any and all security for payment therefor and guaranties thereof, said assignment to be collateral security for payment and discharge in full of any and all of the Primary Obligations.

5.    **Lien Subordination.** To the extent that any or all of the Subordinated Obligations are secured by any assets of Borrower, then such lien, security interest or encumbrance and all collateral documents in connection therewith, and all modifications, amendments, consolidations thereto, and all rights of Creditor to receive insurance proceeds and condemnation awards in connection therewith, are subordinated and made junior to all liens, security interests or encumbrances of the Lender in any and all assets and property of Borrower, whether real or personal, tangible or intangible, wherever located, and whether now owned or hereafter acquired. This subordination is effective notwithstanding (i) the priorities that would ordinarily result from the order of granting or attaching or the order of filing or recording any financing statement, deed or other instrument (or any failure to do so); (ii) the enforceability of any of Lender's liens, security interests or encumbrances; and (iii) the bankruptcy, reorganization or other insolvency proceeding of Borrower. Creditor waives any right it may have to assert that Lender should marshal assets subject to a lien securing the Primary Obligations.

6.    **Subordinated Instrument.** Creditor agrees not to demand or receive any new note, certificate of stock, or other instrument evidencing the Subordinated Obligations or any part thereof while this Agreement is in effect without the prior written consent of Lender. Creditor agrees to hold in trust for, and to endorse and immediately deliver to, Lender, any and all such notes, certificates of stock or other instruments which may be received by Creditor with or without demand by Creditor, or without the prior written consent of Lender, or to the acceptance of which Lender may hereafter so consent. Creditor agrees that any and all such notes, certificates of stock or other instruments which may be delivered to Lender as set forth herein or otherwise may be held by Lender, subject to the terms and conditions of this Agreement. If the Subordinated Obligations are not evidenced by an instrument in writing, Creditor and Borrower agree, at Lender's request, to reduce the Subordinated Obligations to writing and Creditor further agrees to endorse such instruments as aforesaid. Creditor shall legend any documents evidencing the Subordinated Obligations, any security documents and/or financing statements to indicate that the Subordinated Obligations and, as applicable, any liens, security interests or encumbrances securing the Subordinated Obligations, are subject to the terms of this Agreement.

7.    **Standstill Covenants.** Creditor hereby covenants, as long as this Agreement is in effect, that Creditor will not, unless and until the Primary Obligations are fully and irrevocably paid and satisfied and all financial and other arrangements between Lender and Borrower have been terminated, and prior thereto, without Lender's prior written consent: (i) accelerate, request, demand, take, accept, or receive from or on behalf of Borrower, by setoff or in any other manner, any monies representing all or any part of the Subordinated Obligations except as may be expressly permitted by this Agreement; (ii) initiate or participate with others in any suit, action, or proceeding, including, without limitation, any bankruptcy, reorganization, or insolvency proceeding against Borrower, or exercise any other rights or remedies to collect or enforce the Subordinated Obligations; (iii) repossess, foreclose upon, or otherwise take any action against, or exercise any rights or remedies with respect to, any collateral securing all or any part of the Subordinated Obligations; (iv) request, demand, take, accept, or receive any security for the Subordinated Obligations, other than as provided in any collateral documents in effect on the date hereof; (v) enter into any other subordination agreement with respect to any of the Subordinated Obligations or assign, transfer, pledge or otherwise dispose of the Subordinated Obligations or any portion thereof, other than with Lender; or (vi) release, surrender, exchange, or permit a discharge of, or change any term or condition of, any of the Subordinated Obligations. Without in any way limiting the general application of the covenants above, Creditor hereby specifically agrees, without limitation, as follows: Creditor shall not, at any time (i) assert, claim or raise any challenge or objection to Lender's priority over Creditor with respect to debts owed by, and liens on assets of, Borrower, as provided for in this agreement; (ii) assert, claim or raise any challenge or objection to, or take any action to delay, any sale, liquidation or other disposition, supported by Lender, of any assets that constitute, or purportedly constitute, collateral securing the Primary Obligations; (iii) in the context of any bankruptcy, reorganization or insolvency proceeding involving Borrower and/or Borrower's assets, assert, claim or raise any

2    © M&T Bank, 2012

challenge or objection to (a) any cash collateral or adequate protection arrangement supported by Lender, (b) any debtor-in-possession financing arrangement supported by Lender, or (c) any reorganization plan supported by Lender, nor shall Creditor support or vote in favor of any such arrangement or plan that Lender opposes.

8.  **Authorizations & Waivers.**

   a.    This Agreement is a continuing agreement and Creditor authorizes Lender, without notice or demand and without affecting Creditor's obligations hereunder, from time to time: (i) to renew, extend, increase, accelerate or otherwise change the time for payment of the terms of or the interest on the Primary Obligations, or any part thereof, and to modify or amend any other term or condition in the document(s) or instrument(s) which may evidence the Primary Obligations from time to time; (ii) to take from any party (including Borrower) and hold collateral (other than the Subordinated Obligations) for the payment of the Primary Obligations, or any part thereof, and to exchange, enforce or release such collateral or any part thereof; (iii) to accept and hold any endorsement or guaranty of payment of the Primary Obligations, or any part thereof and to release or substitute any such endorser or guarantor, or any party (including Borrower) who has given any security interest in any collateral as security for the payment of the Primary Obligations, or any part thereof, or any other party in any way obligated to pay the Primary Obligations, or any part thereof; (iv) to direct the order or manner of the disposition of any and all other collateral and the enforcement of any and all endorsements and guaranties relating to the Primary Obligations, or any part thereof, as Lender, in its sole discretion, may determine; (v) to exercise or refrain from exercising any rights or remedies against Borrower or any other person or waive any Event of Default; and (vi) to exercise, or refrain from exercising, any rights or remedies under this Agreement which is directly or indirectly conditioned upon the occurrence of an Event of Default even if the Lender waives such Event of Default or refrains from taking action against Borrower or any other person based upon such Event of Default.

   b.    To the fullest extent permitted by applicable law, Creditor waives (i) any defense based on or arising out of any defense of Borrower or the unenforceability of the Primary Obligations or any part thereof from any cause, or the cessation from any cause of the liability of Borrower (other than the final and indefeasible payment in full in cash of the Primary Obligations) and (ii) presentment to, demand of payment from and protest to Borrower of any of the Primary Obligations, and also waives notice of acceptance and notice of protest for non-payment.  To the fullest extent permitted by applicable law, the obligations of Creditor hereunder shall not be affected by (a) the failure of Lender to assert any claim or demand or to enforce or exercise any right or remedy against Borrower; (b) any rescission, waiver, amendment or modification of any agreement with Borrower; or (c) the failure to perfect any security interest in, or the release of, any security held by Lender with regard to the Primary Obligations.  The obligations of Creditor and the rights of Lender hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Primary Obligations), including any claim of waiver, release, surrender, alteration or compromise of any of the Primary Obligations and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the Primary Obligations or otherwise.  Without limiting the generality of the foregoing, the obligations of Creditor hereunder shall not be discharged, impaired or otherwise affected by the failure of Lender to assert any claim or demand or to enforce any remedy under its agreements with Borrower, by any waiver or modification of any provision thereof, by any default, failure or delay, willful or otherwise, in the performance of the Primary Obligations, or by any other act or omission that may or might in any manner or to any extent vary the rights of Creditor or that would otherwise operate as a discharge of Creditor's obligations or Lender's rights against Creditor as a matter of law or equity (other than the indefeasible payment in full in cash of all of the Primary Obligations).

9.  **Rights of Lender.**

   a.    To enable Lender to assert and enforce its rights under this Agreement, upon the occurrence of an Event of Default, Lender is hereby irrevocably appointed attorney-in-fact for Creditor, and subrogated to the rights and claims of Creditor, with regard to the Subordinated Obligations with full power to act in the place and stead of Creditor including the right (i) to demand, collect, compromise and receive payment of the Subordinated Obligations or any part thereof; (ii) to make, present, file and vote such proofs of claim against Borrower on account of all or any part of the Subordinated Obligations in any proceeding (formal or informal) with respect to the receivership, bankruptcy, reorganization, arrangement, assignment for the benefit of creditors, adjustment of debts, insolvency or liquidation of Borrower, regardless of the existence or value of any collateral held by Lender as collateral for payment of the Primary Obligations, including, without limitation, voting such claims at any meeting of creditors of Borrower and voting such claims for or against any proposed plan in any such proceeding, all as Lender deems appropriate to protect its interest; and (iii) to demand, sue for, receive and collect any and all dividends or other payments made on the Subordinated Obligations and to apply the same on account of the Primary Obligations (including, without limitation, any fees and expenses incurred by Lender including attorneys' fees) before application to the Subordinated Obligations.  By execution and delivery of this Agreement, Lender has the full power and authority, but not the obligation, to take any and all acts as may be necessary to enforce any and all of the Subordinated Obligations, to exercise any rights as assignee of any security for payment of the Subordinated Obligations, to effectuate the aforesaid power of attorney, and to effect collection of any and all dividends or other payments which may be made or required at any time on account thereof; and no further documents or instruments of any kind whatsoever shall be required to effectuate Lender's rights under this Agreement or to implement the provisions of this Agreement.

   b.    In the event Borrower is the subject of a bankruptcy or similar type of insolvency proceeding, Creditor consents (and shall not object) to the entry of orders or stipulations providing for the granting of post-petition liens to Lender, other forms of adequate protection (including super-priority status), and the use of cash collateral or borrowing terms satisfactory to Lender, and Creditor will not object to or appeal from any such stipulations or orders.

   c.    After an Event of Default, in the event of any sale or disposition of any collateral securing the Subordinated Obligations, Creditor shall execute and deliver to Lender and/or Borrower all such consents, releases, assignments and other instruments with respect to such collateral, including, without limitation, UCC-3 partial releases or termination statements or mortgage satisfactions, as Lender may request in order to effect such sale or disposition.

   d.    Creditor shall not have any right to contest any of the procedures or actions taken by Lender to foreclose or liquidate any collateral held by Lender (whether under this Agreement or otherwise), including, without limitation, any price or other terms of sale of such collateral, or to enforce any of Lender's other rights and remedies with respect thereto.

   e.    If Creditor shall commence, prosecute, or participate in any suit, action, or proceeding against Borrower or Lender, in violation of this Agreement, or shall attempt to enforce, foreclose upon or realize upon any collateral securing all or any part of the Subordinated Obligations, Borrower or Lender may (but is not obligated to) interpose as a defense the terms and conditions of this Agreement, and Lender may intervene and interpose such defense in its name or in the name of Borrower.

10.  **Representations and Warranties.**  Creditor hereby represents and warrants as follows:

   a.    There exists no events of default under the Subordinated Obligations, or events or conditions which with the passage of time, the giving of notice, or both, would constitute an event of default under the Subordinated Obligations and the Subordinated Obligations are not subject to any offset, counterclaim or defense.

b.    The outstanding principal amount of the Subordinated Obligations as of the date of this Agreement is set forth on Schedule A.

c.    Creditor has all requisite power to enter into this Agreement and to carry out the provisions hereof and has duly authorized the execution and delivery of this Agreement. The execution and delivery of this Agreement and the performance of the obligations hereunder do not violate any provision of law, any order, rule or regulation of any court or governmental agency or its charter, articles of incorporation, bylaws or other relevant organization documents or constitute a default under any agreement or other instrument to which it is a party or by which it is bound. Creditor has duly executed and delivered this Agreement and it constitutes a legal, valid and binding obligation enforceable against it in accordance with its terms and no consent, license, approval, or authorization of, or registration, declaration, or filing with, any court, governmental body, authority, or other person or entity is required in connection with the valid execution, delivery and performance of this Agreement, other than filings and recordings in connection with this Agreement.

d.    Creditor has not previously assigned, transferred, or granted any interest in the Subordinated Obligations to any party, no party owns an interest in the Subordinated Obligations other than Creditor, whether as a joint holder of the Subordinated Obligations, a participant, or otherwise, the entire Subordinated Obligations are owing to Creditor, and the Subordinated Obligations shall continue to be owing only to Creditor.

11.  **Further Assurances.**  Creditor agrees to execute and deliver to Lender such other and further powers of attorney or other documents, instruments, agreements or writings as Lender may request at any time or from time to time in order to effectuate the terms and conditions of this Agreement.

12.  **Notice of Default.**  Creditor agrees to give Lender notice of any default by Borrower of any of Borrower's obligations to Creditor.

13.  **Specific Performance.**  Lender is hereby authorized to demand specific performance of this Agreement at any time when Creditor shall have failed to comply with any of the provisions of this Agreement. Creditor hereby irrevocably waives any defense based on the adequacy of a remedy at law, or any other defense which might be asserted as a bar to such remedy of specific performance. Further, the parties acknowledge that breach of this Agreement by Creditor could cause irreparable harm to Lender for which there may be no adequate remedy at law; and, therefore, Lender is entitled to injunctive relief in the event of an anticipated or actual breach by Creditor of the terms hereof.

14.  **Notices.**  Any demand or notice hereunder or under any applicable law pertaining hereto shall be in writing and duly given if delivered to Creditor (at its address on the Lender's records) or to the Lender (at the address on page one and separately to the Lender officer responsible for Borrower's relationship with the Lender). Such notice or demand shall be deemed sufficiently given for all purposes when delivered (i) by personal delivery and shall be deemed effective when delivered, or (ii) by mail or courier and shall be deemed effective three (3) business days after deposit in an official depository maintained by the United States Post Office for the collection of mail or one (1) business day after delivery to a nationally recognized overnight courier service (*e.g.*, Federal Express). Notice by e-mail is not valid notice under this or any other agreement between Creditor and the Lender.

15.  **Information.**  Creditor assumes all responsibility for being and keeping itself informed of Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of non-payment of the Primary Obligations and the Subordinated Obligations and the nature, scope and extent of the risks that Creditor assumes and incurs hereunder, and agrees that Lender will not have any duty to advise Creditor of information known to it regarding such circumstances or risks.

16.  **Miscellaneous.**

a.    This Agreement contains the entire agreement between Lender and Creditor with respect to this subordination, and supersedes every course of dealing, other conduct, oral agreement and representation previously made by Creditor. All rights and remedies of Lender under applicable law and this Agreement or amendment of any provision hereof are cumulative and not exclusive. No course of dealing between Creditor and the Lender and no delay or omission by the Lender in exercising any right or remedy hereunder or with respect to any Primary Obligations shall operate as a waiver thereof or of any other right or remedy, and no single or partial exercise thereof shall preclude any other or further exercise thereof or the exercise of any other right or remedy Lender, Borrower and Creditor as used herein shall include the heirs, executors or administrators, or successors or assigns, of those parties. No modification, rescission, waiver, release or amendment of any provision of this Agreement shall be made except by a written agreement subscribed by Creditor and by a duly authorized officer of Lender. If a court deems any provision of this Agreement to be void, the remainder of the Agreement shall remain in effect. Section headings are for convenience only. Borrower agrees that in any legal proceeding, a copy of this Agreement kept in the Lender's course of business may be admitted into evidence as an original. Singular number includes plural and neuter gender includes masculine and feminine as appropriate.

b.    Lender shall have no obligation to collect the Subordinated Obligations. Further, Lender shall have no obligation whatsoever for maintenance, protection, preservation or liquidation of any security for the Subordinated Obligations.

c.    Creditor has, to the extent deemed necessary by Creditor, reviewed the existing Agreements between Lender and Borrower, as such have been presented to Creditor by Borrower, and understands that there is no commitment or obligation on Lender's part to make any loans or advances or to extend credit to Borrower except as may be contained in current and presently effective written agreements between Lender and Borrower; provided, however, that Creditor further understands that such agreements may be modified, altered, or amended, without notice to or consent of Creditor.

d.    Creditor agrees to pay all costs and expenses (including attorneys' fees) which Lender may incur in protecting or enforcing any of its rights hereunder and/or against Creditor.

e.    All terms, unless otherwise defined in this Agreement, shall have the definitions set forth in the Uniform Commercial Code, as the same may be in effect in the State of New Jersey, as amended from time to time.

17.  **Joint and Several.**  If more than one party executes this Agreement, the term "Creditor" shall include each as well as all of them and their obligations, warranties and representations hereunder shall be joint and several. If there is more than one Borrower, then the term "Borrower" shall include each as well as all of them.

18.  **Governing Law and Jurisdiction.**  This Agreement has been delivered to and accepted by the Lender and will be deemed to be made in the State of New Jersey. Unless provided otherwise under federal law, this Agreement will be interpreted in accordance with the laws of the State of New Jersey excluding its conflict of laws rules.  **CREDITOR HEREBY IRREVOCABLY CONSENTS TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT IN NEW JERSEY IN ANY COUNTY OR JUDICIAL DISTRICT WHERE THE LENDER MAINTAINS A BRANCH AND CONSENTS THAT THE LENDER MAY EFFECT ANY SERVICE OF PROCESS IN THE MANNER AND AT CREDITOR'S ADDRESS SET FORTH ABOVE FOR PROVIDING NOTICE OR DEMAND; PROVIDED**

THAT NOTHING CONTAINED IN THIS AGREEMENT WILL PREVENT THE LENDER FROM BRINGING ANY ACTION, ENFORCING ANY AWARD OR JUDGMENT OR EXERCISING ANY RIGHTS AGAINST CREDITOR INDIVIDUALLY, AGAINST ANY SECURITY OR AGAINST ANY PROPERTY OF CREDITOR WITHIN ANY OTHER COUNTY, STATE OR OTHER FOREIGN OR DOMESTIC JURISDICTION. Creditor acknowledges and agrees that the venue provided above is the most convenient forum for both the Lender and Creditor and waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Agreement.

19. Trial by Jury. CREDITOR AND LENDER HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT TO TRIAL BY JURY CREDITOR OR LENDER MAY HAVE IN ANY ACTION OR PROCEEDING, IN LAW OR IN EQUITY, IN CONNECTION WITH THE TRANSACTION DOCUMENTS OR THE TRANSACTIONS RELATED THERETO. CREDITOR REPRESENTS AND WARRANTS THAT NO REPRESENTATIVE OR AGENT OF LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WILL NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THIS RIGHT TO JURY TRIAL WAIVER.


By: _____

_____    Ephraim Zinkin
Signature of Witness

_____
Typed Name of Witness


### ACKNOWLEDGMENT


STATE OF _____ )
                          : SS.
COUNTY OF _____ )

    On the _____ day of _____, in the year 2018, before me, the undersigned, a Notary Public in and for said State, personally appeared Ephraim Zinkin, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public


---

LENDER USE ONLY

Authorization Confirmed: _____
                                        Signature

## SCHEDULE A

### Description of Subordinated Obligations (§1(b))

Loan evidenced by that certain Promissory Note dated February 1, 2018 in the principal amount of $400,000 and executed by Michael Chang, Julie Chang and ICON Eyewear, Inc.

## SCHEDULE B

### Permitted Payments on Subordinated Obligation §2

Any payment made in cash consisting of a regularly scheduled payment of **interest** with respect to the Subordinated Obligation listed on Schedule A, **provided however**, that the interest shall be calculated at the same interest rate accruing on the Permitted Obligations of Borrower to Lender, prior to the imposition of any default rate of interest by the Lender. For purpose of clarity, if the applicable interest rate on the Permitted Obligations is x%, then interest on the Subordinated Obligation shall be calculated at the same x% for purpose of determining the permitted interest payment. The interest accruing on the Subordinated Obligation in excess of x% may accumulate, but shall not be paid so long as any Primary Obligations to Lender are outstanding. The payments may not be made to Creditor if Lender notifies Creditor or Borrower that an Event of Default has occurred.

## BORROWER'S AGREEMENT

The undersigned Borrower, mentioned in the foregoing General Subordination Agreement, hereby acknowledges receipt of a copy thereof, acknowledges that the Subordinated Obligations mentioned therein are payable as stated therein, and agrees (i) to make no payment on the Subordinated Obligations so long as there are any outstanding Primary Obligations, except such payments specifically permitted in Section 2 of the Subordination Agreement without Lender's consent; (ii) not to issue any note or other instrument evidencing the Subordinated Obligations, to give any security therefor, or accept any extension, renewal, refinancing, release or modification thereof; and/or (iii) that the Subordinated Obligations are not subject to any counterclaim, setoff or defense. If there are more than one undersigned, the term "Borrower" herein and in the Subordination Agreement shall include each as well as all of them, and their obligations hereunder and under the Subordination Agreement shall be joint and several.

Date: _____, 2018

ICON EYEWEAR, INC.

By: _____

_____
Signature of Witness

Name:  Michael W. Chang

_____
Typed Name of Witness

Title:    Chief Executive Officer

### ACKNOWLEDGMENT

STATE OF _____ )
                                              : SS.
COUNTY OF _____ )

On the _____ day of _____, in the year 2018, before me, the undersigned, a Notary Public in and for said State, personally appeared Michael W. Chang, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

_____

### LENDER USE ONLY

Authorization Confirmed: _____
                                                                    Signature

PHIL1 6945538v.1

# EXHIBIT H

**From:** Mike Chang
**Sent:** Tuesday, June 12, 2018 7:25 PM
**To:** Effy Zinkin <Effy.Z@iconeyewear.com>
**Subject:** RE: Loan Agreement / Employment Agreement

Effy,

I too am glad that we had this talk. Although things are bit tough for the next few months, I believe we will have an unbelievable future in the upcoming years.
Again, I totally appreciate what you've done and is doing. I hope you didn't take what I've said today in a slightest negative way. I too believe that we should have total open and honest discussions between us in all issues.

Thanks again.

Mike

**From:** Effy Zinkin
**Sent:** Tuesday, June 12, 2018 3:46 PM
**To:** Mike Chang <Mike@iconeyewear.com>
**Subject:** Loan Agreement / Employment Agreement

Per our discussion today, currently my employment contract provides for two years severance.

We will amend the severance provisions as follows provided if, and only if (unless otherwise agreed in writing in the future) the $100k bonus for 2017 that has been temporarily deferred, plus the $400k loan, with all contracted for interest pursuant to the promissory note you previously signed, are paid in full by Dec 31, 2018. If all is not paid back by the above date, The severance provision remains as currently drafted in the employment agreement.

Provided I am paid in full by Dec 31, 2018, then the severance provision will be amended as follows:

1. Under any circumstance if I was terminated prior to December 31, 2022 I would be provided 2 full years of severance [Mike, I made it 4 years from the payback deadline vs the 5 you originally suggested]

2. At any point thereafter, if I was terminated under any circumstances after December 31, 2022 I would be provided 1 full year of severance

3. At any point during my employment, if the Company has an annual Net Income of $5M or greater in any single calendar year (using the same methodology as use to calculate our net income in our independently prepared annual financials) than the previous paragraph #2 would no longer apply and I would receive 2 full years severance should I be terminated thereafter.

Lastly, while the current promissory note provides that interest on my loan increases from 12% to 18% starting August 1, 2018, if and only if I am paid back in full all bonus money, loan principal and interest as of Dec 31, 2018, I will return (or we can deduct from the last payment) the difference in interest paid from 12% to 18% (or stated another way 6%) during the Aug 1 thru Dec 31 timeline.

All the above said, our previous discussion regarding partial payments would still apply with several large tuition bills coming due in the month of August.

I am glad we had the discussion. I would never want something to fester between us. The healthiest thing we can always do is continue to have an open and honest dialogue as we work to get this company back on the right track.

# EXHIBIT I

① 400k
paid by eoy

still on salary &
all expenses till
EOY.

② Salary Severance
till end of March

③ If not paid by
~~e~~ EOY salary
& expenses ongoing
& salary only
for 3 months from
full payment of 400k.

① Loan 8400k + outstanding interest
• If paid by Dec. 31, all expenses
currently paid continue until date
of full loan + interest payment &
until Dec 31 then just have salary until
March 31

• If paid after Dec. 31, all
expenses currently paid continue
until date of full payment &
then just have salary until June
30th or 3 months after
full payment — whichever is
later

Cobra 6 months from time of payment

Nov. loan interest will be paid
by Nov. 1

Non-Compete waiver
If take a job so is of
the base paid period.

# EXHIBIT J

AGREEMENT dated as of September 27, 2018 by and among ICON EYEWEAR, INC., a New Jersey corporation with its executive offices located at 5 Empire Boulevard, South Hackensack, NJ 07606 (the "Company"), MICHAEL W. CHANG residing at 34 Mountain Ridge Road, Livingston, NJ 07039 ("Chang") and EPHRAIM ZINKIN residing at 487 Harrison Avenue, Highland Park, NJ 08904 ("Zinkin").

In consideration of the mutual covenants contained herein and for other good and valuable consideration, the parties hereto agree as follows:

1.    Termination of Employment.

(a)    Zinkin hereby resigns his position as an officer and employee of the Company effective on November 1, 2018.

(b)    The employment agreement dated November 16, 2016 between the Company and Zinkin, as amended by an agreement dated February 1, 2018 (collectively the "Amended Employment Agreement") is hereby terminated and replaced as of September 30, 2018, pursuant to the terms hereof.

(c)    (i) The Company acknowledges that Zinkin has provided to the Company all Company information in his possession and provided same to the Company, and that he no longer has any proprietary Company information or property in his possession and has not retained copies thereof; and (ii) the Company shall, no later than seven (7) days after execution of the Agreement, delete all records of any of Zinkin's personal UserIDs, logins, passwords or passcodes that the Company may have access to on its premises or its systems. The Company further agrees and represents and warrants to Zinkin that the Company will not retain or use any copies or summaries of any of the UserIDs, logins, passwords or passcodes to access Zinkin's personal information or accounts.

2.    Payment of Amounts Due.

(a)    The Company shall make the following payments to Zinkin:

(i)    When due, his annual salary of $375,000 through September 30, 2018, subject to withholding taxes and other payroll taxes and deductions required by law.

(ii)    Amounts due him in respect to the period prior to October 1, 2018 under Sections 5, 6, 8, 9 and 10 of the Amended Employment Agreement and shall be paid pursuant to the parties' prior payment practices.

3.      The Promissory Note.

(a)      The Company and Mike and Julie Chang are the obligors under a promissory note dated February 1, 2018 in the principal amount of $400,000 executed by the Company, and the Changs to the order of Zinkin (the "Promissory Note"). The Promissory Note is in full force and effect enforceable in accordance with its terms.  T the Confessions of judgment executed by the Company and the Changs for the unpaid principal of the Promissory Note plus interest dated February 1, 2018 (the "Confessions of Judgment") are in full force and effect and enforceable in accordance with their terms.

(b)      Michael Chang hereby represents that, Chang shall pay, or cause the Promissory Note to be paid, in full on or before March 31, 2019 and the parties hereby agree that the interest thereon shall be due at the rate of 12% and will be paid when due until the Promissory Note is paid in full. Zinkin agrees that except as provided in Section 3(c), he shall not call the Promissory Note prior to March 31, 2019 or exercise his rights under the Confessions of Judgment.  Upon receipt by Zinkin of all interest and principal due under the Promissory Note, Zinkin shall transfer and/or assign the Promissory Note to Chang or Chang's designee, who shall assume and agree to be bound by all of Zinkin's obligations under a certain subordination agreement between M&T Bank and Zinkin.

(c)      If prior to March 31, 2019, (i) the Company defaults in its payment obligations under this Agreement, or (ii) the interest on the Promissory Note, as provided herein, is not timely paid as provided therein, or (iii) any amounts due under Promissory Note, including principal and interest, are not paid in full on or before March 31, 2019, Zinkin shall be free to exercise any and all of his rights under the Confessions of Judgment.

4.      Salary and Benefit Continuation.  From October 1, 2018 through March 31, 2019, the Company shall (a) continue to pay Zinkin his annual salary of $375,000 per year on the regular payroll dates, subject to withholding taxes and other payroll taxes and deductions required by law; (b) continue to pay the premiums at current levels in accordance with the Company's present payment policy covering him and his family under the various medical and health insurance policies maintained by the Company for its employees. After the Severance Period (as defined below), Zinkin shall be entitled to continued coverage under COBRA at Zinkin's own expense.  The Salary and Benefit Continuation payments are being made as a compromise for the Company's severance obligations of twenty-four months of pay under the Amended Employment Agreement; and (c) continue to pay Zinkin amounts due him in respect to the period prior through December 31, 2018 under Sections 9 (life insurance premium payments) of the Amended Employment Agreement, which shall be paid pursuant to the parties' prior payment practices.  The Salary and Benefit Continuation payments are not, and should not be, construed in any way to pay down the principal or any interest due and owing under the Promissory Note.



5.  <u>Zinkin's Covenants</u>. From and after the date hereof, Zinkin covenants and agrees with the Company as follows:

(a)  Except in response to legal process or with the written consent of an officer of the Company, he shall not disclose any confidential information pertaining to the Company, or its shareholders, directors, officers, employees, customers or vendors that came to be known to him while in the Company's employ.

(b)(i) For a period of twelve months from the date hereof, he will not, directly or indirectly, do eyewear business with Costco or Target; and (ii) he will not, directly or indirectly (for the benefit of any company in which he is employed or owns any interest greater than 3%), solicit any employees of the Company to take employment elsewhere.

(c)  He will not criticize or make derogatory or negative statements, orally or in writing, to third parties about the Company or any of its shareholders, directors, officers or employees.

6.  <u>The Company's Covenants</u>. From the date hereof, the Company covenants and agrees with Zinkin as follows;

(a)  Except in response to legal process or with the written consent of Zinkin, the Company shall not disclose any confidential information pertaining to Zinkin.

(b)  The Company and Chang shall not criticize or make derogatory or negative statements, orally or in writing, to third parties about Zinkin.

(b)  If Zinkin refers prospective employers to the Company, the Company will respond to their inquiries consistent with stating that he resigned his employment under amicable circumstances. The Company shall not challenge any claim to unemployment benefits made by Zinkin after the date hereof with respect to his employment by the Company.

7.  <u>Releases.</u>

(a)  Except as otherwise provided below, Zinkin for himself, his legal representatives, heirs and assigns forever remises, releases and discharges the Company and its past, present and future shareholders, directors, officers, employees, agents, representatives, affiliates, subsidiaries, and their predecessors, successors and their heirs, and assigns (collectively the "<u>Releasees</u>") from any and all claims, agreements, causes of action, demands or liabilities of any nature whatsoever, whether now known or claimed, (collectively, "<u>Claims</u>"), which Zinkin had or now has or may ever have against any of the Releasees for any reason whatsoever at any time up to the date of execution of this Agreement whether accrued, absolute, contingent, unliquidated or otherwise and whether known or unknown on the date hereof and which have or may have arisen out of any transaction or state of facts existing prior to the date

–3–

hereof, including, without limitation, all Claims arising from or relating to Zinkin's employment with the Company and the termination of such employment, and specifically Claims under any federal, state or local constitution, statute or regulation or any common or foreign law right, including, but not limited to, Claims in any way related to the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, Civil Rights Act of 1988, Equal Pay Act, Fair Labor Standards Act, Americans with Disabilities Act, Employee Retirement Income Security Act, Older Workers Benefit Protection Act, all applicable state and local labor and employment laws (including all laws concerning unlawful and unfair labor practices), breach of contract, wrongful discharge, defamation or intentional infliction of emotional distress; provided, however, that the foregoing release does not apply to and shall not be construed as applying to any Claim (i) which Zinkin may have against any of the Releasees arising under this Agreement after the date hereof, including but not limited to enforcing the Agreement; (ii) under the Promissory Notes and Confessions of Judgment executed by the Company, Chang and his wife Julie Chang; (iii) for vested benefits under the Company's health, welfare or pension plans; (iv) for indemnity relating to Zinkin's performance within the scope of his duties while employed by the Company; or (v) for benefits or the right to seek benefits under workers' compensation or unemployment compensation statutes.

(b)     The Company for itself, and for its shareholders, directors, officers, employees, managers, attorneys, agents, representatives, affiliates, subsidiaries, successors, predecessors and their heirs and assigns forever remises, releases and discharges Zinkin and his personal representatives, agents, heirs and assigns (collectively, the "Zinkin Releasees") for any reason whatsoever at any time up to the date of execution of this Agreement from any and all Claims, which it or they had, now have or may ever have against any of the Zinkin Releasees, whether accrued absolute, contingent, unliquidated or otherwise, and whether known or unknown on the date hereof, and which have or may have arisen out of any transaction or state of facts existing prior to the date hereof, including but not limited to, Claims in any way related to Zinkin's employment with the Company or the termination of that employment; provided, however, that the foregoing release does not apply to and shall not be construed as applying to any Claim which the Company may have against any of the Zinkin Releasees arising under this Agreement after the date hereof including but not limited to enforcing this Agreement.

(c)     Each of Zinkin and the Company warrants to the other that he/it has not assigned any Claim that he/it has or may have against the Releasees, in the case of Zinkin, or against the Zinkin Releasees, in the case of the Company, to any third party.

8.     Miscellaneous.

(a)     Any notice required or permitted to be given under this Agreement shall be sufficient if it is sent by email to each party at the following email addresses (to Zinkin: effy.zinkin@gmail.com; to the Company: mike@iconeyewear.com) or by, a nationally recognized courier service or by Express Mail, return receipt requested, for delivery on the next business day to the parties at the addresses set forth in the preamble to this Agreement. A notice

-4-

given as above provided shall be deemed to have been delivered on the next business day after it is sent. A party may change the address to which notice to it shall be sent hereunder by giving the other party notice of its change of address in the manner above provided.

(b)     This Agreement contains the entire understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof, including without limitation the Amended Employment Agreement, except that the Promissory Note and the Confessions of Judgement which shall continue in full force and effect.

(c)     The Company's obligations to make payments to Zinkin or for his benefit as provided in this Agreement shall survive his death. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, heirs, successors and assigns, and in addition thereto the releases contained in Section 8 shall inure to the benefit of the persons or entities described therein as Releasees or Zinkin's Releasees.

(d)     No provision of this Agreement may be amended or modified, and no provision of this Agreement may be waived except by a further instrument in writing signed by the parties hereto.

(e)     This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New Jersey without reference to that State's conflict of law rules.

9.     <u>Zinkin's Legal Rights.</u> Zinkin acknowledges and agrees as follows:

(a)     He has been afforded at least twenty-one (21) days to consider the terms and conditions contained in this Agreement and that he is entering into it freely and knowingly;

(b)     He has been given full opportunity to consult with counsel prior to entering into this Agreement or has done so; and

(c)    He may revoke this Agreement for a period of seven (7) calendar days from the date he executes it by sending timely notice thereof to the Company at the address in the preamble to this Agreement in the manner provided in Section 8(a).

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

ICON EYEWEAR, INC.

By_____

Michael W. Chang, President

_____

MICHAEL W. CHANG

_____

EPHRAIM ZINKIN

# EXHIBIT K

*Expense Report*

**i C O N**
E Y E W E A R

NAME: **EFFY ZINKIN**          For the Week Ended: _____    **MONTH OF SEPT**

| Expense Items | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Total Expenses | Less: Direct Expenses | Net Reimbursable Expenses |
|---|---|---|---|---|---|---|---|---|---|---|
| Hotel | | | | | | | | $0.00 | | $0.00 |
| Breakfast | | | | | | | | $0.00 | | $0.00 |
| Lunch | | | | | | | | $0.00 | | $0.00 |
| Dinner | | | | | | | | $0.00 | | $0.00 |
| Entertainment | | | | | | | | $0.00 | | $0.00 |
| Air/ Rail/ Bus | | | | | | | | $0.00 | | $0.00 |
| Taxi / Limo | | | | | | | | $0.00 | | $0.00 |
| Parking | | | | | | | | $0.00 | | $0.00 |
| Auto Rental | | | | | | | | $0.00 | | $0.00 |
| Gas | | | | | | | | $0.00 | | $0.00 |
| Tolls | $496.73 | | | | | | | $496.73 | | $496.73 |
| Miles Driven | | | | | | | | $0.00 | | $0.00 |
| Mileage | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $0.00 |
| Telephone | $23.52 | | | | | | | $23.52 | | $23.52 |
| Postage | | | | | | | | $0.00 | | $0.00 |
| Off Supplies | | | | | | | | $0.00 | | $0.00 |
| Samples | | | | | | | | $0.00 | | $0.00 |
| Misc. other | | | | | | | | $0.00 | | $0.00 |
| Daily Total | $520.25 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $520.25 | $0.00 | $520.25 |

Mileage Reimbursement Rate = $   0.540  per mile

Less: Travel Advance: _____
Less: Personal Expenses: _____
**Net Due to Employee:**   $520.25

| Travel to: | | | | | | |
|---|---|---|---|---|---|---|
| Travel from: | | | | | | |

Exchange rate used for fx funds transfer(s):

$ 1.00 =     0.00 units      currency

Exchange Date:

### Entertainment Detail:

| Date | L/D/O ** | Person(s) Entertained | Company | Business Reason | Amount |
|---|---|---|---|---|---|
| SEPT | | Final Toll Bill - prorated for only Sept | | | |
| SEPT | | Final Phone Bill - prorated for Sept | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

** (L/D/O= Lunch, Dinner or Other)

### Comments/Explain Miscellaneous other (Indicate date and description)

Final Toll Bill & Phone Bill - each pro-rated to cover through the agreed upon end date of Sept 30, 2018

**for accounting dept. use only:**

| Account | Amount | Account | Amount |
|---|---|---|---|
| 53080 | $0.00 | 56000 | $0.00 |
| 53050 | $0.00 | 53030 | $0.00 |
| 53600 | $0.00 | 53500 | $0.00 |
| 51020 | $0.00 | 54100 | $0.00 |
| 53060 | $496.73 | 12050 | $0.00 |
| 53100 | $23.52 | Personal | $0.00 |
| | | TOTAL | $520.25 |

Employee: _____   10/29/2018
          Signature              Date

Approved By: _____   10/29/18
            Signature            Date

EFFY ZINKIN
Print

Invoice number

3799983224

KEYLINE

EPHRAIM ZINKIN
487 HARRISON AVE
HIGHLAND PARK, NJ 08904-2707

**See last page for payment information and how to split your bill.**
Questions? Visit vzw.com/contactus

# Hi Ephraim, here's your bill for this month.



One-time charges                    page 3          ~~$70.90~~

The new Verizon Plan XX Large 24 GB                 $110.00

Devices and add-ons                 page 5          ~~$259.80~~    $31.48

Surcharges                                          $16.76

Taxes and government fees                           $18.19

**$475.65**

**Due November 18**
Autopay November 16

$176.43 for the month

This bill includes 4 days in Sept &
26 days in October. So pro-rated
equals    ~~$XXXXX~~    $23.52

Side 1 of 4                                                                        005

**E-ZPass®**
New York Service Center
P.O. Box 15187
Albany, NY 12212-5187

Statement Date:  10/18/18
Account Number:  11702259
Agency:  Port Authority of New York & New Jersey
Activity For:  08/17/18-10/16/18
Replenishment Method:  MASTERCARD
Replenishment Amount:  $460.00

0003505
EPHRAIM ZINKIN
487 HARRISON AVE
HIGHLAND PARK, NJ 08904-2707

*Total: $636.02*
*Thru Sept. 30, 2018: $496.73*

---

**E-ZPass®**

**New York Service Center**

Side 1 of 4

## PLEASE READ CAREFULLY

0003505

Account Number:  11702259
Activity For:  08/17/18 - 10/16/18
Tag Deposit:  $0.00

Stay on top of your *E-ZPass* Account information! OPT-IN to Mobile Alerts to be notified of low balance, payment status, change in replenishment amount, and more. To sign up, log in to your account, select Account Profile, and provide a mobile phone number in the Account Holder Information section. Read the Terms and Conditions (required) then select Mobile Alerts --"I agree to the Terms and Conditions and want to Opt-in". Reply "Yes" to the confirmation text to complete the process.



| POSTING DATE | TRANSACTION DATE | TAG NUMBER/ PLATE | AGENCY | PLAZA | ENTRY DATE | ENTRY TIME | PLAZA | EXIT DATE | EXIT TIME | PLAN | CL | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 08/17/18 | 08/17/18 | Service Fee | | | | | | | | | | $1.00 | $554.01 |
| 08/17/18 | 08/15/18 | 00502569632 | NJTP | 18W | 08/15 | 12:50 | 9 | 08/15 | 13:26 | STANDARD | 1 | $7.55 | $546.46 |
| 08/18/18 | 08/15/18 | 00502569632 | NJTP | 9 | 08/15 | 10:56 | 18E | 08/15 | 11:22 | STANDARD | 1 | $7.55 | $538.91 |
| 08/19/18 | 08/16/18 | 00502569633 | NJTP | 10 | 08/16 | 18:43 | 18E | 08/16 | 19:04 | STANDARD | 1 | $7.40 | $531.51 |
| 08/20/18 | 08/16/18 | 00502569633 | NJTP | 18W | 08/16 | 21:43 | 9 | 08/16 | 22:10 | STANDARD | 1 | $7.55 | $523.96 |
| 08/20/18 | 08/17/18 | 00502569633 | NJTP | 16E | 08/17 | 14:46 | 9 | 08/17 | 15:18 | STANDARD | 1 | $6.50 | $517.46 |
| 08/20/18 | 08/17/18 | 00502569633 | NJTP | 10 | 08/17 | 08:20 | 16W | 08/17 | 08:41 | STANDARD | 1 | $6.10 | $511.36 |
| 08/21/18 | 08/21/18 | 00502569633 | MTAB&T | | | | VNB | 08/21 | 17:27 | STANDARD | 1 | $11.52 | $499.84 |
| 08/22/18 | 08/21/18 | 00502569633 | PANYNJ | | | | OBX | 08/21 | 14:07 | STANDARD | 1 | $10.50 | $489.34 |
| 08/22/18 | 08/20/18 | 00502569633 | NJTP | 16W | 08/20 | 18:12 | 9 | 08/20 | 18:41 | STANDARD | 1 | $6.50 | $482.84 |
| 08/22/18 | 08/20/18 | 00502569633 | NJTP | 10 | 08/20 | 07:46 | 16W | 08/20 | 08:15 | STANDARD | 1 | $6.10 | $476.74 |
| 08/22/18 | 08/21/18 | 00502569633 | NJTP | 16W | 08/21 | 12:43 | 9 | 08/24 | 13:08 | STANDARD | 1 | $6.50 | $470.24 |
| 08/22/18 | 08/21/18 | 00502569633 | NJTP | 10 | 08/21 | 08:01 | 16W | 08/21 | 08:25 | STANDARD | 1 | $6.10 | $464.14 |
| 08/22/18 | 08/21/18 | 00502569633 | NJTP | 13 | 08/21 | 17:38 | 9 | 08/21 | 17:53 | STANDARD | 1 | $2.90 | $461.24 |
| 08/23/18 | 08/23/18 | Parking Pmt | | | | | | | | | | $20.00 | $461.24 |
| 08/23/18 | 08/22/18 | 00502569633 | PANYNJ | | | | LT | 08/22 | 08:57 | STANDARD | 1 | $12.50 | $448.74 |
| 08/23/18 | 08/22/18 | 00502569633 | NJTP | 10 | 08/22 | 18:31 | 16E | 08/22 | 08:52 | STANDARD | 1 | $6.10 | $442.64 |
| 08/23/18 | 08/22/18 | 00502569633 | NJTP | 14C | 08/22 | 19:27 | 9 | 08/22 | 19:53 | STANDARD | 1 | $6.65 | $435.99 |
| 08/23/18 | 08/23/18 | 00502569633 | NJTP | 10 | 08/23 | 07:07 | 18E | 08/23 | 07:27 | STANDARD | 1 | $7.40 | $428.59 |
| 08/24/18 | 08/23/18 | 00502569633 | NJTP | 18E | 08/23 | 17:16 | 9 | 08/23 | 18:06 | STANDARD | 1 | $7.55 | $421.04 |
| 08/24/18 | 08/23/18 | 00502569633 | PANYNJ | | | | GWL | 08/23 | 07:46 | STANDARD | 1 | $12.50 | $408.54 |
| 08/24/18 | 08/24/18 | 00502569633 | NJTP | 10 | 08/24 | 07:51 | 16W | 08/24 | 08:11 | STANDARD | 1 | $6.10 | $402.44 |
| 08/25/18 | 08/24/18 | 00502569633 | NJTP | 16W | 08/24 | 15:16 | 9 | 08/24 | 15:57 | STANDARD | 1 | $6.50 | $395.94 |
| 08/27/18 | 08/23/18 | 00502569633 | MassDOT | 083 | 08/23 | 10:30 | 113 | 08/23 | 11:02 | STANDARD | 2 | $1.70 | $394.24 |
| 08/27/18 | 08/23/18 | 00502569633 | MassDOT | 613 | 08/23 | 13:38 | 583 | 08/23 | 14:03 | STANDARD | 2 | $1.70 | $392.54 |
| 08/28/18 | 08/27/18 | 00502569633 | NJTP | 9 | 08/27 | 11:01 | 1 | 08/27 | 12:15 | STANDARD | 1 | $6.50 | $386.04 |
| 08/28/18 | 08/27/18 | 00502569633 | VDOT | | | | MWB | 08/27 | 18:02 | STANDARD | 2 | $2.09 | $383.95 |
| 08/28/18 | 08/27/18 | 00502569633 | VDOT | | | | NTP | 08/27 | 15:53 | STANDARD | 1 | $13.00 | $370.95 |
| 08/28/18 | 08/27/18 | 00502569633 | DRBA | | | | DMB | 08/27 | 12:20 | STANDARD | 1 | $4.00 | $366.95 |
| 09/02/18 | 09/02/18 | 00502569633 | MdTA | | | | BHT | 09/02 | 00:38 | STANDARD | 2 | $4.00 | $362.95 |
| 09/02/18 | 09/02/18 | 00502569633 | MdTA | | | | JFK | 09/02 | 01:08 | STANDARD | 2 | $8.00 | $354.95 |
| 09/02/18 | 09/02/18 | 00502569633 | NJTP | 1 | 09/02 | 01:37 | 9 | 09/02 | 02:38 | STANDARD | 1 | $6.50 | $348.45 |
| 09/02/18 | 09/02/18 | 00502569633 | NJTP | 10 | 09/02 | 16:39 | 18E | 09/02 | 16:58 | STANDARD | 1 | $7.40 | $341.05 |
| 09/03/18 | 09/02/18 | 00502569633 | NJTP | 18E | 09/02 | 20:51 | 9 | 09/02 | 21:18 | STANDARD | 1 | $7.55 | $333.50 |
| 09/05/18 | 09/04/18 | 00502569633 | NJTP | 10 | 09/04 | 07:41 | 16E | 09/04 | 08:14 | STANDARD | 1 | $6.10 | $327.40 |



**New York Service Center**

Side 2 of 4

Account Number: 11702259

| POSTING DATE | TRANSACTION DATE | TAG NUMBER/ PLATE | AGENCY | PLAZA | ENTRY DATE | TIME | PLAZA | EXIT DATE | TIME | PLAN | CL | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/05/18 | 09/04/18 | 00502569633 | PANYNJ | | | | LT | 09/04 | 10:28 | STANDARD | 1 | $10.50 | $316.9 |
| 09/05/18 | 09/04/18 | 00502569633 | NJTP | 16W | 09/04 | 19:12 | 9 | 09/04 | 19:36 | STANDARD | 1 | $6.50 | $310.4 |
| 09/05/18 | 09/05/18 | 00502569633 | NJTP | 10 | 09/05 | 07:34 | 16W | 09/05 | 08:06 | STANDARD | 1 | $6.10 | $304.3 |
| 09/06/18 | 08/27/18 | 00502569633 | DelDOT | | | | BCP | 08/27 | 12:36 | STANDARD | 2 | $1.00 | $303.3 |
| 09/06/18 | 08/27/18 | 00502569633 | DelDOT | | | | DD | 08/27 | 12:58 | STANDARD | 2 | $1.00 | $302.3 |
| 09/06/18 | 09/05/18 | 00502569633 | NJTP | 16W | 09/05 | 18:13 | 9 | 09/05 | 18:44 | STANDARD | 1 | $6.50 | $295.8 |
| 09/07/18 | 09/06/18 | 00502569633 | NJTP | 10 | 09/06 | 08:12 | 16W | 09/06 | 08:41 | STANDARD | 1 | $6.10 | $289.7 |
| 09/07/18 | 09/06/18 | 00502569633 | NJTP | 16W | 09/06 | 18:19 | 9 | 09/06 | 18:54 | STANDARD | 1 | $6.50 | $283.2 |
| 09/07/18 | 09/07/18 | 00502569633 | NJTP | 16W | 09/07 | 07:58 | 16W | 09/07 | 08:24 | STANDARD | 1 | $6.10 | $277.1 |
| 09/08/18 | 09/07/18 | 00502569633 | NJTP | 16W | 09/07 | 13:19 | 9 | 09/07 | 13:46 | STANDARD | 1 | $6.50 | $270.6 |
| 09/08/18 | 09/07/18 | 00502569633 | PANYNJ | | | | OBX | 09/07 | 17:33 | STANDARD | 1 | $12.50 | $258.1 |
| 09/09/18 | 09/08/18 | 00502569633 | PANYNJ | | | | OBX | 09/08 | 22:15 | STANDARD | 1 | $10.50 | $247.6 |
| 09/11/18 | 09/07/18 | 00502569633 | NJTP | 13 | 09/07 | 18:02 | 9 | 09/08 | 18:16 | STANDARD | 1 | $2.90 | $244.7 |
| 09/11/18 | 09/08/18 | 00502569633 | NJTP | 13 | 09/08 | 22:41 | 9 | 09/08 | 22:54 | STANDARD | 1 | $2.90 | $241.8 |
| 09/11/18 | 09/02/18 | 00502569633 | DelDOT | | | | D95 | 09/02 | 01:22 | STANDARD | 2 | $4.00 | $237.8 |
| 09/11/18 | 09/09/18 | 00502569632 | NJTP | 16W | 09/09 | 11:50 | 16W | 09/02 | 12:12 | STANDARD | 1 | $6.10 | $231.7 |
| 09/11/18 | 09/09/18 | 00502569632 | NJTP | 16W | 09/09 | 13:42 | 9 | 09/09 | 14:07 | STANDARD | 1 | $6.50 | $225.2 |
| 09/11/18 | 09/09/18 | 00502569633 | NJTP | 7A | 09/09 | 12:20 | 9 | 09/09 | 12:42 | STANDARD | 1 | $1.65 | $223.5 |
| 09/12/18 | 09/12/18 | 00502569633 | NJTP | 9 | 09/12 | 11:34 | 7 | 09/12 | 11:56 | STANDARD | 1 | $2.15 | $221.4 |
| 09/13/18 | 09/13/18 | 00502569633 | NJTP | 10 | 09/13 | 09:51 | 16E | 09/13 | 10:21 | STANDARD | 1 | $6.10 | $215.3 |
| 09/13/18 | 09/13/18 | 00502569633 | NJTP | 16E | 09/13 | 16:43 | 15W | 09/13 | 16:53 | STANDARD | 1 | $1.35 | $213.9 |
| 09/14/18 | 09/13/18 | 00502569633 | PANYNJ | | | | LT | 09/13 | 10:40 | STANDARD | 1 | $10.50 | $203.4 |
| 09/15/18 | 09/12/18 | 00502569633 | NJTP | | | | 9 | 09/12 | 17:00 | STANDARD | 1 | $2.15 | $201.3 |
| 09/17/18 | 09/16/18 | 00502569633 | NJTP | 10 | 09/16 | 14:13 | 18E | 09/16 | 14:32 | STANDARD | 1 | $7.40 | $193.90 |
| 09/17/18 | 09/16/18 | 00502569633 | NJTP | 18E | 09/16 | 17:18 | 9 | 09/16 | 17:56 | STANDARD | 1 | $7.55 | $186.35 |
| 09/17/18 | 09/17/18 | Service Fee | | | | | | | | | | $1.00 | $185.35 |
| 09/18/18 | 09/17/18 | 00502569633 | GSP | | | | UNI | 09/17 | 18:19 | STANDARD | 1 | $1.50 | $183.85 |
| 09/20/18 | 09/20/18 | 00502569633 | NJTP | 10 | 09/20 | 12:05 | 16E | 09/20 | 12:25 | STANDARD | 1 | $6.10 | $177.75 |
| 09/21/18 | 09/20/18 | 00502569633 | NJTP | 16E | 09/20 | 17:49 | 9 | 09/20 | 18:31 | STANDARD | 1 | $6.50 | $171.25 |
| 09/26/18 | 09/26/18 | 00502569633 | PANYNJ | | | | LT | 09/20 | 12:28 | STANDARD | 1 | $10.50 | $160.75 |
| 09/26/18 | 09/26/18 | 00502569633 | MTAB&T | | | | VNB | 09/26 | 15:35 | STANDARD | 1 | $11.52 | $149.23 |
| 09/26/18 | 09/26/18 | 00502569633 | NJTP | 13 | 09/26 | 15:50 | 9 | 09/26 | 16:04 | STANDARD | 1 | $2.90 | $146.33 |
| 09/26/18 | 09/26/18 | 00502569633 | NJTP | 10 | 09/26 | 17:06 | 18E | 09/26 | 17:28 | STANDARD | 1 | $7.40 | $138.93 |
| 09/27/18 | 09/26/18 | 00502569633 | NJTP | 18W | 09/26 | 19:54 | 9 | 09/26 | 20:18 | STANDARD | 1 | $7.55 | $131.38 |
| 09/27/18 | 09/27/18 | 00502569633 | PANYNJ | | | | OBX | 09/26 | 12:19 | STANDARD | 1 | $10.50 | $120.88 |
| 09/27/18 | 09/27/18 | 00502569633 | NJTP | 10 | 09/27 | 09:30 | 16E | 09/27 | 09:50 | STANDARD | 1 | $6.10 | $114.78 |
| 09/27/18 | 09/27/18 | 00502569633 | NJTP | 15X | 09/27 | 14:37 | 9 | 09/27 | 15:02 | STANDARD | 1 | $5.95 | $108.83 |
| 09/28/18 | 09/27/18 | 00502569633 | PANYNJ | | | | LT | 09/27 | 10:00 | STANDARD | 1 | $10.50 | $98.33 |
| 09/28/18 | 09/28/18 | 00502569633 | NJTP | 10 | 09/28 | 08:50 | 16E | 09/28 | 09:26 | STANDARD | 1 | $6.10 | $92.23 |
| 09/28/18 | 09/28/18 | 00502569633 | NJTP | 16E | 09/28 | 12:35 | 9 | 09/28 | 13:00 | STANDARD | 1 | $6.50 | $85.73 |
| 09/29/18 | 09/29/18 | Prepaid Toll Pay | | | | | | | | | | $460.00 | $545.73 |
| 09/29/18 | 09/29/18 | 00502569633 | PANYNJ | | | | LT | 09/28 | 09:56 | STANDARD | 1 | $12.50 | $533.23 |
| 10/01/18 | 09/30/18 | 00502569633 | NJTP | 10 | 09/30 | 13:13 | 18E | 09/30 | 13:47 | STANDARD | 1 | $7.40 | $525.83 |
| 10/01/18 | | 00502569633 | NJTP | 18E | 09/30 | 14:56 | 9 | 09/30 | 15:19 | STANDARD | 1 | $7.55 | $518.28 |
| 10/03/18 | 10/02/18 | 00502569633 | NJTP | 10 | 10/02 | 20:00 | 18E | 10/02 | 20:20 | STANDARD | 1 | $7.40 | $510.88 |
| 10/03/18 | 10/03/18 | 00502569633 | NJTP | 18W | 10/02 | 21:08 | 9 | 10/02 | 21:35 | STANDARD | 1 | $7.55 | $503.33 |
| 10/03/18 | 10/03/18 | 00502569633 | MTAB&T | | | | RKB | 10/03 | 14:49 | STANDARD | 1 | $5.76 | $497.57 |
| 10/03/18 | 10/03/18 | 00502569633 | GSP | | | | BB | 10/03 | 17:41 | STANDARD | 1 | $1.50 | $496.07 |
| 10/04/18 | 10/04/18 | 00502569633 | NJTP | 18E | 10/04 | 00:48 | 9 | 10/04 | 01:09 | STANDARD | 1 | $7.55 | $488.52 |
| 10/04/18 | 10/03/18 | 00502569633 | PANYNJ | | | | GWU | 10/03 | 18:25 | STANDARD | 1 | $12.50 | $476.02 |
| 10/04/18 | 10/03/18 | 00502569633 | PANYNJ | | | | OBX | 10/03 | 09:49 | STANDARD | 1 | $12.50 | $463.52 |
| 10/05/18 | 10/04/18 | 00502569633 | PANYNJ | | | | OBX | 10/04 | 05:40 | STANDARD | 1 | $10.50 | $453.02 |
| 10/08/18 | 10/07/18 | 00502569632 | NJTP | 10 | 10/07 | 13:24 | 18E | 10/07 | 13:45 | STANDARD | 1 | $7.40 | $445.62 |
| 10/08/18 | 10/08/18 | 00502569632 | NJTP | 18W | 10/07 | 14:54 | 9 | 10/07 | 15:25 | STANDARD | 1 | $7.55 | $438.07 |
| 10/09/18 | 10/08/18 | 00502569633 | MTAB&T | | | | BWB | 10/08 | 18:41 | STANDARD | 1 | $5.76 | $432.31 |
| 10/09/18 | 10/08/18 | 00502569633 | NJTP | 18W | 10/08 | 22:01 | 9 | 10/08 | 22:26 | STANDARD | 1 | $7.55 | $424.76 |
| 10/10/18 | 10/10/18 | 00502569633 | GSP | | | | UNI | 10/09 | 16:55 | STANDARD | 1 | $1.50 | $423.26 |
| 10/10/18 | 10/09/18 | 00502569633 | NJTP | 18W | 10/10 | 00:23 | 9 | 10/10 | 00:48 | STANDARD | 1 | $7.55 | $415.71 |
| 10/10/18 | 10/09/18 | 00502569633 | PANYNJ | | | | GWP | 10/09 | 18:54 | STANDARD | 1 | $12.50 | $403.21 |
| 10/14/18 | 10/10/18 | 00502569633 | NJTP | 10 | 10/10 | 10:16 | 18E | 10/10 | 10:36 | STANDARD | 1 | $7.40 | $395.81 |
| 10/14/18 | 10/14/18 | 00502569633 | MTAB&T | | | | CBB | 10/14 | 17:37 | STANDARD | 1 | $2.16 | $393.65 |
| 10/14/18 | 10/14/18 | 00502569633 | MTAB&T | | | | MPB | 10/14 | 17:28 | STANDARD | 1 | $2.16 | $391.49 |
| 10/15/18 | 10/14/18 | 00502569633 | PANYNJ | | | | OBX | 10/14 | 16:35 | STANDARD | 1 | $12.50 | $378.99 |



**New York Service Center**

Side 3 of 4

Account Number: 11702259

| PREPAID TOLL BALANCE | |
|---|---|
| Beginning Balance | $555.01 |
| Tolls, Non-Tolls and Fees | $636.02 |
| Payments/Adjustments | $460.00 |
| Ending Balance | $378.99 |





## New York Service Center

Side 4 of 4

Account Number: 11702259

| | | | | ENTRY | | | EXIT | | |
|---|---|---|---|---|---|---|---|---|---|
| TRANSACTION DATE | TAG NUMBER | AGENCY | PLAZA | DATE | TIME | PLAZA | DATE | TIME | AMOUNT |
| 08/21/18 | 00502569633 | NYNJArpt | JFB | 08/21 | 15:05 | JFB | 08/21 | 16:38 | $20.00 |

**E-ZPass Plus** — All non-toll charges of $20 or greater that appear in this section have been charged directly to your credit card and have had no effect on your E-ZPass Prepaid Toll balance.

Thank you for using E-ZPass.

PLAZA DESCRIPTIONS

| | | |
|---|---|---|
| 083 - Charlton - East | 1  - Delaware Memorial Bridge | 10  - I-287/Metuchen/Edison Twsp |
| 113 - Framingham - East | 13  - I-278/Eliz/Goethals/Verrazano | 14C - Holland Tunnel |
| 15W - I-280/Newark/The Oranges | 15X - Secaucus Transfer Station | 16E - Lincoln Tunnel/NJ 3/Secaucus |
| 16W - Sprtsplx/NJ 3/Secaucus/Ruthrfrd | 18E - Lincoln Tunnel/NJ 3/Secaucus | 18W - Geo Washington Br/US 46/I-80 |
| 583 - Charlton - West | 613 - Framingham - West | 7  - Bordentown/Trenton |
| 7A  - I-195/Trenton/Shore Points | 9  - New Brunswick/Admin Bldg | BCP - Biddles Plaza |
| BER - Bergen | BHT - Baltimore Harbor Tunnel | BWB - Bronx Whitestone Br |
| CBB - Cross Bay Br | D95 - Newark Plaza | DD  - Dover Plaza |
| DMB - Delaware Memorial Br | GWL - Geo Washington Br Lower Level | GWP - Geo Washington Br Palisades |
| GWU - Geo Washington Br Upper Level | JFB - JFK Airport - Blue Lot | JFK - I-95 JFK Memorial Highway |
| LT - Lincoln Tunnel | MPB - Marine Pkwy Br | MWB - Midtown Tunnel - Westbound |
| NTP - CBBT: North Toll Plaza | OBX - Outerbridge Crossing | RKB - RFK Br - Bronx |
| UNI - Union | VNB - Verrazano Narrows Br | |

For questions about Kennedy Airport Parking, call (718) 244-4168.